IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROY L. ELLIS,<br><br>　　　　　　　　　Petitioner,<br><br>vs.<br><br>ROB JEFFREYS, Director, Nebraska<br>Department of Correctional Services;<br><br>　　　　　　　　　Respondent. | **8:23CV315**<br><br><br>**FINDINGS AND RECOMMENDATION** |

A jury found that Petitioner Roy L. Ellis ("Ellis") murdered 12-year-old Amber Harris in late 2005. He was sentenced to death for his crime. The Nebraska Supreme Court affirmed his conviction and death sentence twice, and Ellis has now filed a second postconviction motion in state court which remains pending. Ellis petitions this court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Filing No. 1). United States District Judge Brian C. Buescher referred the matter to the undersigned to prepare findings of fact and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B). (Filing No. 61). Ellis challenges both his conviction and death sentence arising from the criminal proceedings held in Douglas County, Nebraska. (Filing No. 1). He assigns multiple errors relating to the evidence presented at his trial, at his capital sentencing proceedings, and the performance of his counsel. His filings also contain a request for an evidentiary hearing and/or additional discovery and what may be construed as a motion to reconsider the district court's prior order denying a stay. (Filing No. 54 at 6-12)[1].

Upon a careful and thorough review of the record, and for the reasons that follow, the undersigned finds and recommends that the motion for reconsideration, request for an evidentiary hearing or additional discovery, and all claims asserted in the Petition be denied in their entirety.

---

[1] All record citations are to the CM/ECF page number, which corresponds to the pdf page number in each document.

# I.     BACKGROUND AND PROCEDURAL HISTORY

A.     The Crime and Charges

It is common practice in federal habeas matters to utilize the state court's recitation of basic underlying facts. *See e.g., Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006). The court does so here and references the Nebraska Supreme Court's background section included in its opinion issued on direct appeal. *See State v. Ellis*, 799 N.W.2d 267, 278–80 (Neb. 2011) (*available at* Filing No. 13-1).

> Amber disappeared on November 29, 2005, after she was dropped off by her school bus about five blocks from her North Omaha, Nebraska, home. A few weeks later, Ellis was arrested and incarcerated in the Douglas County Correctional Center on unrelated charges. Several witnesses reported that while in jail, before Amber's body was found or Ellis was a suspect in her killing, he made a number of remarks suggesting that he was involved in Amber's disappearance.

> To begin with, Ellis made telephone calls from jail suggesting that he needed to get out of jail to take care of some things and "find some stuff." Ellis had lived in a boarding house on Lake Street, although he moved to another residence nearby before Amber disappeared. While in jail, Ellis called his former neighbors, asking repeatedly about any activity at the boarding house. But no more of those calls were made after February 14, 2006, when Amber's bookbag was found in a large trash storage container behind the boarding house. Although Ellis continued to call his former neighbor after the bag was found, he no longer asked about the boarding house.

> While he was incarcerated during early 2006, Ellis also repeatedly asked Terrelle Smith, a Douglas County corrections officer, for information regarding Amber's case. Because Smith was studying criminal justice, Ellis also asked him questions about criminal investigation, regarding subjects such as fingerprint identification and the decomposition of buried bodies. Ellis asked Smith whether blood or semen left outside would be contaminated by the elements and how long it would take before contaminated semen would no longer be considered relevant evidence. And Ellis asked Smith for books on forensics and DNA examination. Ellis also asked Brandon Clark, another corrections officer, about how long semen would last inside a dead body and in a forested, rural area and asked Clark to perform Internet research for him on the subject.

> Ellis also asked Darryl Chambers, a fellow inmate, if he knew how long semen would last inside a decomposed body. And another inmate, Clarence Dennis, heard Ellis asking other inmates questions about how long blood and semen would last when exposed to the elements and what was necessary to keep dirt from subsiding above a buried body. Clenix Martin, another inmate, said Ellis had asked him about the persistence of DNA left outside, whether DNA could be traced after a body had decomposed, and how long it took a body to decompose.

Ellis also made more particular statements that foreshadowed what would be discovered about the circumstances of Amber's disappearance after her body was found. Dennis heard Ellis say that he had previously taken women to Hummel Park, in a rural area north of Omaha, and forced them to have sex with him by threatening to leave them in the park alone at night. Smith overheard Ellis saying that if a woman did not do what he wanted, "[h]e would just hit them upside their heads." Ellis told Chambers that he liked underage girls. Ellis told his cellmate, David Shaffer, that he had sexually molested underage girls, some of them at Hummel Park.

Shaffer said that Ellis expressed an unusual interest in Amber's disappearance and cut out newspaper articles about the case. Ellis told Martin that he had sexually assaulted a young girl and strangled her. When Shaffer mentioned to Ellis that it was "crazy what happened to that Amber Harris girl," Ellis replied, "that's why I got to get out and cover my tracks." And both Dennis and Chambers said Ellis had admitted to sexually assaulting Amber and striking her in the head. According to Dennis, Ellis said he hit Amber in the head with a hammer.

Finally, on May 11, 2006, Amber's decomposed body was discovered by passersby, covered with a mound of soil, in a secluded, wooded area of Hummel Park. Amber had been killed by blunt force trauma to the skull, resulting from at least two blows to the head with a blunt object. Because of decomposition, it was impossible to tell whether Amber had also been choked or strangled. Although Amber's sweater was still on, her jeans and underwear had been removed. Amber's jacket, jeans, and bra had been found in her bookbag. Amber's blood was on the jacket and jeans, and DNA was found on the jeans, in a shape resembling a handprint, in a mixture from which Ellis could not be excluded as a contributor.

(Filing No. 13-1 at 5-6).

The State of Nebraska (the "State") charged Ellis with the first-degree murder of Amber on theories of both premeditated murder and felony murder, for which the predicate felony was sexual assault or attempted sexual assault. (Filing No. 13-15 at 4-6). In the alternative, the State charged Ellis with killing Amber during the perpetration or attempted perpetration of a first-degree sexual assault. (Filing No. 13-15 at 5). The criminal information contained the following notice of aggravators pursuant to Neb. Rev. Stat. § 29-2523(1):

(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has substantial prior history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of such crime;

(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.

3

(*Id.*)

Douglas County District Court Judge Gregory M. Schatz presided over the case. Judge Schatz appointed attorney Patrick Dunn as counsel and later appointed Jerry Hug as co-counsel. (Filing No. 13-17 at 13, 15-16 and Filing No. 13-33 at 56).

B.    Pre-Trial Motions

The parties filed a number of pre-trial motions, some of which bear mention here. The State filed a motion for hearing pursuant to Nebraska Rule of Evidence 27-404 governing "other acts evidence" relating to the commission of prior sexual assaults for the purpose of "proving motive, opportunity, intent, preparation, plan, knowledge, identity or lack of mistake" (the "404 motion"). (Filing No. 13-14 at 8). The State in particular sought to offer at trial evidence that Ellis had sexually assaulted his former stepdaughters Aquanta Birge ("Aquanta") and Aisha Birge ("Aisha") when they were between 12 and 15 years old. (Filing No. 13-1 at 5-6). The State also sought to offer evidence of another sexual assault relating to Camille Ellis ("Camille"), and Ellis' purported abduction of another woman, Antoinette Pollock ("Antoinette"). (Filing No. 13-14 at 8). Ellis filed a motion *in limine* to exclude this evidence, arguing that the testimony was not relevant and did not provide any insight to the State's specific theory or admissibility of the requested evidence. (Filing No. 13-14 at 11, 13).

The trial court set the matter for hearing and received testimony from Aisha, Antoinette, and two Omaha police officers. (Filing No. 13-17 at 22-191). The trial court granted in part and denied in part both motions, finding that the evidence of Ellis' sexual assaults of Aquanta and Aisha were "independently relevant to the crime charged" and the similarities between the crime charged and the prior bad acts made the evidence probative as to identity and intent. (Filing No. 13-14 at 17-36) (hereinafter the "Propensity Evidence"). Ellis filed a motion for reconsideration and another motion *in limine* on the same issue, both of which were denied. (Filing No. 13-14 at 96-97, 108-109). He later filed a motion *in limine* seeking to prohibit the State from adducing testimony or evidence from Antoinette concerning his connection to Hummel Park, which was granted "at least as to jury selection and the State's opening statement at trial." (Filing No. 13-14 at 117-18, 134).

In addition to the 404 motion, the State sought to offer testimony from certain "jailhouse informers," in particular "testimony from someone the defendant did tell that he sexually assaulted Amber Harris prior to her death." (Filing No. 13-17 at 191-195). The Court granted the State's motion to reopen the record and heard the testimony of Clarence Dennis ("Dennis") on that issue. (Filing No. 13-17 at 194, 200-22). Ellis sought to exclude the testimony, as well as testimony offered from another informer Clenix Martin ("Martin"). The trial court denied the motion and concluded that because the witnesses were no longer in custody, they were technically not jailhouse informers. The court further noted that even if they were, the State had provided Ellis with each witness's criminal history printout and confirmed that no promise or benefit had been made in exchange for their testimony. (Filing No. 13-14 at 129-33).[2]

Ellis requested additional discovery, including the names and inducements offered to any "jailhouse informers," the statements he allegedly made to them, all cases known to the State where any of the named informers testified or offered statements and any inducements offered to them in those cases, and whether the informers had ever recanted testimony. (Filing No. 13-14 at 6). The week before trial, Ellis filed a motion to continue, alleging the State failed to disclose any of the required information relating to its informer witnesses and a motion to exclude the testimony of Martin, Dennis, and others. (Filing No. 13-14 at 121-22, 124-128). The court denied the motions. (Filing No. 13-14 at 129-33).

Ellis filed a motion seeking recusal and reassignment of the case to another judge. He argued in part that Judge Schatz was biased because he had presided over a prior criminal case involving Ellis, in which Antoinette had been the named victim. Ellis expressed concern that the judge had already made credibility determinations as to both. (Filing No. 13-15 at 15-16). The motion was denied after a hearing. (Filing No. 13-17 at 196-199).

Ellis filed a motion to change venue and requested that the trial be moved to another county. In the alternative, Ellis requested the jury pool be drawn from another county due to news coverage and publicity about the case in the area. He also filed a motion *in limine* seeking to exclude any

---

[2] The trial court relied upon a prior version of the jailhouse informer statute, *Neb. Rev. Stat.* § 29-1929, which was repealed after trial and replaced with the current jailhouse informer statutes, *Neb. Rev. Stat.* §§ 29-4701 to 4706. The statute now defines a jailhouse informer as one who will testify about statements made by a suspect or defendant while the suspect or defendant and informant was in custody.

evidence or testimony of PCR DNA testing. (Filing No. 13-14 at 41-45). Both motions were denied after hearing. (Filing No. 13-14 at 70-93). But the trial court did grant Ellis' request to individually examine prospective jurors during *voir dire* regarding capital punishment and their knowledge of the case. (Filing No. 13-14 at 104, 106). The trial court also limited the State from referencing during jury selection or in opening statement alleged drug use and/or distribution, DNA evidence obtained from Ellis' vehicle, certain tools Ellis allegedly possessed, and Ellis' criminal history. The only exceptions concerned prior sexual assaults of Aquanta and Aisha, which were permitted through the 404 motion. (Filing No. 13-14 at 101-02, 111-12).

Ellis later filed a motion to prohibit imposition of the death penalty, arguing that electrocution[3] was prohibited under the Eighth and Fourteenth Amendments of the United States Constitution and Article Nine of the Nebraska Constitution. (Filing No. 13-14 at 46-48). He also filed a motion to "prohibit and quash" further proceedings regarding an aggravation hearing or other proceedings relating to the death penalty, challenging as facially unconstitutional various parts of Nebraska's death penalty statutes. (Filing No. 13-14 at 50-68). The trial court addressed these motions along with a motion for new trial filed by Ellis following his conviction for first degree murder, which were all denied. (Filing No. 13-15 at 96-107).

C.    Trial, Conviction, and Sentence

The matter came on for trial on April 14, 2008, and lasted approximately eleven days. (*See* Filing No. 13-18 at 55-248; Filing No. 13-19; Filing No. 13-20 at 1-200) (*voir dire*) and (Filing No. 13-20 at 200-35; Filing No. 13-21; Filing No. 13-22; Filing No. 13-23; Filing No. 13-24; Filing No. 13-25) (trial transcript)). Thereafter, the jury found Ellis guilty of first-degree murder on April 25, 2008. (Filing No. 13-15 at 37).[4]

The State pursued the death penalty and the trial court set the matter for an aggravation hearing pursuant to *Neb. Rev. Stat.* § 29-2520. (Filing No. 13-14 at 141). Ellis filed a motion to discharge the jury for purposes of holding an aggravation trial, which was denied. (Filing No. 13-

---

[3] At the time of the motion, electrocution was the method Nebraska used to carry out death sentences.

[4] Following the verdict, Ellis moved to compel notice of proposed aggravating circumstance evidence, which was granted on May 1, 2008, the State having complied. (Filing No. 13-14 at 153-54). A judgment on the verdict was filed April 29, 2008. (Filing No. 13-15 at 42).

14 at 135-36, 159-62). He also filed a motion to quash seeking to preclude the aggravation hearing and sentencing proceedings pursuant to *Neb. Rev. Stat. § 29-2532*, and he requested a directed verdict for a sentence of life in prison, which were also denied. (Filing No. 13-14 at 138-39, 155-58). Ellis renewed his motion to declare Nebraska's death penalty statutes as unconstitutional, which was denied after hearing. (Filing No. 13-14 at 141-152).

On April 28, 2008, the same jury was reconvened to determine whether one or more of the statutory aggravating circumstances alleged by the State existed. (Filing No. 13-26). The State adduced evidence in support of the alleged aggravators and the jury unanimously determined that the State had proven two of the three statutory aggravators set forth in *Neb. Rev. Stat. § 29-2523(1)(a)* and (d). In particular, the jury unanimously found beyond a reasonable doubt that "the defendant was previously convicted of another murder or a crime involving the use or threat of violence or has substantial prior history of serious assaultive or terrorizing criminal activity," and that the "murder committed by the defendant was especially heinous, atrocious, cruel, or manifested exceptional depravity." (Filing No. 13-26 at 123-24).

Pursuant to *Neb. Rev. Stat. § 29-2521*, a three-judge sentencing panel (the "Panel") was named on April 30, 2008, for the purpose of considering mitigating or aggravating circumstances. (Filing No. 13-15 at 68). The matter came on for hearing with the Panel on December 19, 2008, and the Panel sentenced Ellis to death on February 9, 2009. (Filing No. 13-15 at 124-52).[5]

D.     Direct Appeal

Ellis (proceeding in forma pauperis and with his same trial counsel Patrick Dunn and Jerry Hug), filed an automatic direct appeal to the Nebraska Supreme Court, assigning two broad categories of error: (1) issues relating to the evidence at trial; and (2) issues arising out of the capital sentencing proceedings (the "Direct Appeal"). (Filing No. 13-1 at 6); (Filing No. 13-14 at 167-68).

As to trial, Ellis alleged that the trial court erred in admitting Propensity Evidence and abused its discretion when it denied two mistrial requests due to prosecutorial misconduct. He

---

[5] Ellis filed a number of routine post-trial motions, all of which were denied. (*See* Filing No. 13-15 at 71-109 (new trial); Filing No. 13-15 at 114-23 (reconsideration and second motion for new trial)).

7

further alleged error when the court denied his motion to exclude jailhouse informer testimony under *Neb. Rev. Stat.* § 29-1929 in violation of his due process rights. Ellis then challenged the trial court's admission of certain DNA evidence and erred in denying his motion *in limine* to exclude evidence or testimony of PCR DNA testing. (Filing No. 13-6 at 13). As to sentencing, Ellis asserted, among other things, a facial challenge to the constitutionality of the death sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments. He also asserted as-applied challenges to the applicability of the statutory aggravating circumstances and argued that removing the determination of life or death from the jury was unconstitutional. Ellis further challenged the sentencing panel's proportionality review and various other aspects of Nebraska's death penalty sentencing scheme.

On May 27, 2011, the Nebraska Supreme Court affirmed Ellis' conviction and sentence. (Filing No. 13-1). Although it concluded that the trial court erred in admitting the Propensity Evidence during the guilt phase of the trial, it found the error harmless given Ellis' statements to witnesses about the crime, the physical evidence, and other circumstantial evidence of his guilt. (Filing No. 13-1 at 9). The Nebraska Supreme Court found no merit to Ellis' remaining assigned errors. (Filing No. 13-1 at 10-34). After conducting a *de novo* review, the court found the death penalty was warranted and proportional in Ellis' case. (Filing No. 13-1 at 10-34). Ellis filed a petition for a writ of certiorari in the U.S. Supreme Court, which was denied on October 27, 2011. (Filing No. 13-4; Filing No. 13-8; Filing No. 13-2).

E.       Postconviction Proceedings

*The First Postconviction Motion*

Ten days after the denial of certiorari on October 27, 2011, Ellis, without the assistance of counsel, initiated state postconviction proceedings by filing a lengthy motion for postconviction relief in state court (the "*pro se* PCM") and a concurrent motion for appointment of postconviction counsel. (Filing No. 36-2; Filing No. 13-16 at 2-72). The *pro se* PCM was 69 pages in length and raised a variety of claims, including claims of ineffective assistance of counsel by Dunn and Hug during trial and in his direct appeal. He also alleged trial court error, along with evidentiary and capital sentencing issues already addressed on direct appeal. (Filing No. 13-16 at 2-72).

On November 21, 2011, Ellis filed a motion to stay the *pro se* PCM until a decision was made on his motion for counsel. ([Filing No. 36-6 at 3](#)). The trial court granted his request for counsel and appointed attorney Mark Weber. ([Filing No. 13-16 at 79](#)). Ellis later filed a motion to remove Weber as counsel in January 2014, alleging that he had not yet begun working on Ellis' case and due to lack of communication. ([Filing No. 36-6 at 9-12](#); *see also* [Filing No. 13-16 at 80](#)). While Weber remained as counsel after the matter was addressed at a hearing, he filed a motion to withdraw as Ellis' counsel several months later, seeking release from representation due to his appointment as Director of the Nebraska Counsel for Discipline. ([Filing No. 13-16 at 89](#)). Weber's motion to withdraw was granted and the court appointed James Regan ("Regan") to represent Ellis. ([Filing No. 13-16 at 92-93](#)).

In November 2014, Regan sought an extension to file a "verified motion for postconviction relief" in Ellis' case. ([Filing No. 13-16 at 94](#)). Three months later, again *pro se*, Ellis filed a lengthy amendment and exhibits to the *pro se* PCM to address issues that he alleged Regan had "refuse[d] to address." ([Filing No. 13-16 at 96-128](#)). On June 5, 2015, Regan filed an "Addendum" to the *pro se* PCM, "supplement[ing] and mak[ing] more definite such claims of ineffective assistance of [trial/direct appeal] counsel," which was just slightly over two pages long (collectively the "First PCM"). ([Filing No. 13-16 at 132-134](#)). In August 2015, Ellis, again without the assistance of counsel, filed letters with the trial court seeking to supplement the First PCM to address claims based on what he contended was newly discovered evidence. ([Filing No. 13-16 at 139-141](#)). A hearing was held regarding the alleged newly discovered evidence on October 1, 2015, which Regan attended. ([Filing No. 13-16 at 147](#)).

Upon review of what the trial court described as the "self-drawn motions for postconviction relief" and attorney Regan's Addendum, the court granted Ellis an evidentiary hearing on the issues of:

> whether he was denied effective assistance of counsel for the failure of his attorneys to competently explore the impact of the Defendant's mental illness and cognitive defects on the Defendant's competence to stand trial, or whether he was criminally insane at the time of the homicide of which he was convicted, as well as their failure to competently challenge the DNA evidence presented by the state at trial, including

the alleged involvement of David Kofoed[6], as raised by the Defendant in this third postconviction motion.

(Filing No. 13-16 at 166-168). Ellis later filed a motion to amend his postconviction motion to add the claim of whether the death penalty procedure in Nebraska is constitutional in light of *Hurst v. Florida*, 577 U.S. 92 (2016). (Filing No. 13-16 at 179-80). The motion was granted, and Ellis filed his amendment on December 4, 2017. (Filing No. 13-16 at 182-85).

The trial court held an evidentiary hearing on March 3, 2021, which was again limited to the issue of ineffective assistance of trial and direct appeal counsel. The court received deposition testimony of Ellis' trial/appellate counsel Dunn and Hug and took judicial notice of the case records and files. (*See* Filing No. 13-16 at 190-91). After considering the evidence, the court found Ellis' claims without merit and denied his motions, including his argument regarding the constitutionality of Nebraska's death penalty procedure in light of *Hurst*. (Filing No. 13-16 at 189-201). Ellis appealed the order to the Nebraska Supreme Court. (Filing No. 13-3). The sole issue Ellis raised on appeal was whether the trial court erred in finding that Ellis' trial counsel was not ineffective in challenging the DNA evidence. (Filing No. 13-10 at 4). The Nebraska Supreme Court affirmed the order and a mandate issued on August 3, 2022. (Filing No. 13-3; Filing No. 13-5). Ellis then filed a habeas petition with this court.

### *The Pending Successive Postconviction Motion*

On October 13, 2023 (after Ellis filed his habeas petition here), he filed a second successive postconviction motion in state court, which remains pending in Douglas County, Nebraska (hereinafter "Second PCM"), (*see* Case No. CR 10-9064652). (Filing No. 36-4). Ellis raised therein seven claims of "ineffective assistance of postconviction counsel for failing to raise… claims of ineffective assistance of trial counsel." The claims raised in the Second PCM generally correspond with the following claims asserted in this petition: 2, 3.7, 3.8, 5, 6, 7, 11 and 12. (Filing No. 36-4). To date, the Douglas County District Court has not yet ruled on the Second PCM.

---

[6] Kofoed was a criminalistics investigator for the Douglas County Sheriff's Office who was accused of mishandling evidence prior to Ellis' arrest. (Filing No. 13-16 at 199). No evidence was offered linking Kofoed to the investigation leading to Ellis' charges in this case. (Filing No. 13-16 at 199).

*Federal Habeas Proceedings*

On July 21, 2023, Ellis filed a Petition for writ of habeas corpus under 28 U.S.C. § 2254. (Filing No. 1). Respondent filed the state court record (Filing Nos. 12 and 13), an Answer (Filing No. 24), a brief in support (Filing No. 26[7]; Filing No. 30), and an Amended Answer (Filing No. 31). In lieu of filing a response, Ellis filed a motion to stay and a brief in support, seeking to stay these proceedings and hold them in abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005). He argued in particular that his habeas petition contains "mixed" claims, acknowledging that some are fully exhausted and ready for federal court review and some are not and remain pending in state court. (Filing No. 36; Filing No. 37 at 6–7). Ellis requested to stay his federal proceeding, arguing that the state court should have the opportunity to address his unexhausted claims. (Filing No. 36; Filing No. 37 at 6-7).

Judge Buescher denied the motion to stay in its entirety. He concluded, among other things: 1) that any attempt to exhaust claims 2, 5, 11, and 12 as newly discovered would fail; 2) there is no avenue for review of Ellis' unpresented ineffective assistance of counsel claims in claims 2, 3.7, 3.8, 5, 6, and 7.1; and, 3) obtaining review of claims 11 and 12 by filing a writ of coram nobis would be futile. (Filing No. 46 at 13, 21, 25). Judge Buescher concluded in his Memorandum and Order that "Petitioner's current and proposed attempts to exhaust any of the Unpresented Claims are futile, rendering all the claims in the Petition fully exhausted either via a full round of meritorious review in the Nebraska State Courts or via anticipatory procedural default." (Filing No. 46 at 26). He denied the stay and ordered Ellis to submit a brief in response to Respondent's Answer. Ellis did not seek reconsideration nor did he appeal.

Ellis filed a Response to the Answer (the "Response") (Filing No. 54), and Respondent filed a Reply (the "Reply") (Filing No. 60), rendering the Petition ripe for review. As noted earlier, the Response also contained a request for evidentiary hearing and seemingly a request to reconsider the prior denial of a stay, which the court construes as motions. As to the latter, Ellis argues again that many of his claims are not procedurally defaulted because he has raised those claims in his

---

[7] Filing No. 26 is the sealed, unredacted version of Respondent's brief. The redacted version is Filing No. 30.

11

Second PCM. (Filing No. 54 at 26, 31, 39, 51, 60-61, 81, 84-85). Not surprisingly, Respondent opposes those requests in the Reply. (Filing No. 60 at 4).

## II.   THE CLAIMS

Ellis raises fifteen claims and numerous subparts in his Petition (Filing No. 1), and those will be addressed in turn. His claims (as stated, but not including all subparts), include the following:

Claim 1: The admission of prejudicial evidence of Ellis' other crimes, wrongs, or acts under *Neb. Rev. Stat.* § 27-404, and the prosecution's use of that evidence to argue propensity, violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Claim 2: The highly inflammatory pretrial publicity was prejudicial, the trial court's denial of his request to change venue violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, and his trial counsel was ineffective in failing to adequately support his motion for change of venue.

Claim 3: The misleading DNA evidence presented to the jury violated Ellis' rights under the Fifth and Fourteenth Amendments to the United States Constitution and *Brady v. Maryland* and his trial counsel was ineffective in challenging the presentation of DNA evidence.

Claim 4: The admission of testimony from jailhouse informants Clarence Dennis and Darryl Chambers violated Ellis' rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and *Brady v. Maryland*.

Claim 5: Ellis' Sixth Amendment right to counsel was violated when trial counsel failed to adequately investigate and present mitigating circumstances for the penalty phase of trial.

Claim 6: Ellis' Sixth Amendment right to effective assistance of counsel was violated when trial counsel failed to take reasonable steps to negotiate a sentence less than death including failing to diligently pursue a plea deal.

Claim 7: Ellis' Fifth, Sixth, and Fourteenth Amendment rights were violated by prosecutorial misconduct in closing statements and because trial counsel failed to object to the misconduct, ask for a curative instruction, or move for a mistrial.

Claim 8: Ellis' trial was presided over by a biased judge in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Claim 9: State post-conviction counsel was ineffective for failing to raise ineffective assistance of trial counsel claims in violation of Ellis' rights under the Fifth and Fourteenth Amendments to the United States Constitution and *Martinez v. Ryan*.

Claim 10: Ellis' death sentence relies on unconstitutionally vague statutory aggravating factors in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Claim 11: Ellis is ineligible for the death penalty under the Eighth Amendment to the United States Constitution and *Atkins v. Virginia*.

Claim 12: Ellis' severe mental illness makes him ineligible for a death sentence under the Eighth Amendment to the United States Constitution.

Claim 13: Nebraska's capital sentencing scheme, requiring a panel of judges to make the findings of fact necessary to impose a death sentence, is unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and *Hurst v Florida*.

Claim 14: The imposition of the death penalty on the basis of race violates the Eighth and Fourteenth Amendments to the United States Constitution.

Claim 15: Ellis' death sentence violates the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishment.

(Filing No. 1 at i-vii).

## III.    GENERAL LEGAL STANDARDS

Given the volume of purported errors and claims raised in the Petition, there are of course a number of legal principles that apply. Those will be discussed and analyzed as needed. Before doing so, however, it may prove useful to provide a broader overview of three standards that pervade, including the statutory requirements governing habeas review under the Antiterrorism and Effective Death Penalty Act of 1996, the requirement that claims raised in federal court must first be exhausted in state court, and general principles governing ineffective assistance of counsel claims.

A.    AEDPA

A state prisoner may seek a writ of *habeas corpus* in federal court if he is "in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") allows for habeas relief in federal court only if the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). "A state court's decision is 'contrary to' clearly established law 'if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Phillips v. Brewer*, 764 F.Supp.3d 837, 845-46 (E.D. Mo. 2025)

13

(*quoting Brown v. Payton*, 544 U.S. 133, 141 (2005)). An "unreasonable application" of clearly established law occurs when "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner." *Id.* (*quoting Brown*, 544 U.S. at 141). As to the second factor, a state court's findings of "basic, primary, or historical facts" are presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence. *Id.* (*quoting Collier v. Norris*, 485 F.3d 415, 423 (8th Cir. 2007)). "Erroneous findings of fact by the state courts do not ensure the grant of habeas relief. Rather, the determination of these facts must be unreasonable in light of the evidence of the record." *Id.*

In our federal system, the "state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is by design, as "[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Id.* (*quoting Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998)). Accordingly, AEDPA imposes strict limitations on what can and cannot be litigated through a habeas petition. Indeed, the United States Supreme Court noted that while AEDPA "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," as it can be a "guard against extreme malfunctions in the state criminal justice systems," it should not be a "substitute for ordinary error correction through appeal." *Id.* (*quoting Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)). "The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is second and limited. Federal courts are not forums in which to relitigate state trials." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).[8]

---

[8] Ellis invokes the Supreme Court's recent decision in *Loper Bright Enterp. v. Raimondo*, 603 U.S. 369 (2024), and argues that the Court's elimination of the so-called "*Chevron* doctrine" suggests that deference to state court decisions under AEDPA also violates Article III and the Supremacy Clause. He requests supplemental briefing on the issue. But Ellis mixes apples and oranges. The Court's holding in *Loper* merely eliminated deference to agency interpretations of statutes and concerns administrative law, not criminal law. AEDPA on the other hand provides for deference to state court decisions, not agencies, and to Supreme Court precedent, not agency interpretation. *See Bates v. Secretary, Florida Department of Corrections,* 2025 WL 2305211, (11th Cir. Aug. 1, 2025) (the Supreme Court's decision in *Loper Bright* is an interpretation of the Administrative Procedure Act – not the constitution); *Piper v. Jackley*, 2025 WL 889374, at *18 (D.S.D. Mar. 21, 2025) ("*Loper Bright* does not render AEDPA unconstitutional, and thus [the petitioner] must satisfy AEDPA's standards to secure relief").

14

B.    Exhaustion and Procedural Default

AEDPA requires that an applicant first exhaust his remedies in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)*; see also Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005) (one complete round in Nebraska ordinarily means the habeas claim must have been presented in an appeal to the Court of Appeals and then through a petition for further review to the Nebraska Supreme Court). Without that full round of review, a claim has not been exhausted and cannot be considered by the federal court. "In the absence of cause and prejudice, or a sufficient showing of likely actual innocence, a federal habeas court may consider only those issues which have been raised and fairly presented to the state courts." *Joubert v. Hopkins*, 75 F.3d 1232, 1240 (8th Cir. 1996).[9]

The court may consider only "those claims which the petitioner has presented to the state court in accordance with state procedural rules." *Abdullah v. Groose*, 75 F.3d 408, 411 (8th Cir. 1996) (*quoting Satter v. Leapley*, 977 F.2d 1259, 1261 (8th Cir. 1992)). "If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now." *Id.* But even where a claim has been procedurally defaulted, a petitioner is entitled to an opportunity to excuse the default. *Lotter v. Houston*, 771 F. Supp. 2d 1074, 1096 (D. Neb. 2011) (*citing Akins*, 410 F.3d at 455–456 n. 1).

The relevant legal standards concerning procedural default were thoroughly set forth in the district court's Memorandum and Order denying a stay (Filing No. 46), and need not be repeated in full here. There, the district court determined that many of Ellis' claims are anticipatorily procedurally defaulted or that an attempt to raise the claims now would be futile. (Filing No. 46 at 13, 21, 25). The task now is only to determine if there are sufficient grounds to excuse any procedural default. As courts have acknowledged, procedural default "does not necessarily imply

---

[9] Ellis broadly challenges the doctrine of procedural default as unconstitutional under the Fourteenth Amendment and violative of separation of powers. (Filing No. 54 at 6). But he cites no authority for that proposition and the doctrine has been utilized and upheld by numerous decisions of the United States Supreme Court and the Eighth Circuit, as referenced herein.

15

that a federal habeas court must deny the claim without reviewing the underlying constitutional issues." *Shockley v. Crews*, 696 F. Supp. 3d 589, 683–84 (E.D. Mo. 2023). Instead, in order to proceed to the merits of an issue, the prisoner must demonstrate cause for the default and actual prejudice. *See Coleman v. Thompson*, 501 U.S. 722 (1991); *see also Shinn v. Ramirez*, 596 U.S. 366, 371, 379 (2022) ("When a claim is procedurally defaulted, a federal court can forgive the default and adjudicate the claim if the prisoner provides an adequate excuse") (internal citation omitted).[10]

"Cause" is "something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n. 24 (1999). Without attempting an exhaustive list of impediments to compliance with a procedural rule, the Supreme Court noted some examples of situations constituting cause under this standard, including a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable. *Id.* "Prejudice" is established by showing a "reasonable probability" that, but for the alleged constitutional violation, the prisoner would not face conviction or whatever other harm the prisoner alleges. *See Thomas v. Payne*, 960 F.3d 465, 477 (8th Cir. 2020). As the Eighth Circuit has noted, "reasonable probability" has the same meaning in the *Coleman* context that the phrase has in the *Strickland* context. *Dorsey v. Vandergriff*, 30 F.4th 752, 756 (8th Cir. 2022) (*quoting Harrington*, 562 U.S. at 111-12).

There exists other potential grounds that may overcome or excuse a procedural default, including claims arising under new constitutional law (*Heffernan v. Norris*, 48 F.3d 331, 333 (8th Cir. 1995)), claims asserting structural error (*United States v. Davila*, 569 U.S. 597, 611 (2013)), or claims for discovery violations under *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court also created an exception for claims alleging ineffective assistance of postconviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 17 and *Trevino v. Thaler*, 569 U.S. 413 (2013). This so-called "*Martinez-Trevino*" exception has been described as "narrow" because it is widely

---

[10] A credible showing of actual innocence may also be an exception to procedural default, but Ellis does not make that claim here. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013).

understood that there is no constitutional right to an attorney in state postconviction proceedings. "[T]he attorney is the petitioner's agent when acting or failing to act… [so] [i]t follows then, that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default." *Shinn*, 596 U.S. at 380. But if a "state's judicial system effectively forecloses direct review of trial-ineffective-assistance claims" and "requires prisoners to raise such claims for the first time during state collateral proceedings", then cause may be shown. *Id.* (*citing Martinez*, 566 U.S. at 9 and *Trevino*, 569 U.S. at 413, 428) (internal quotations omitted).[11]

The Eighth Circuit established in *Marcyniuk v. Payne*, 39 F.4th 988, 996 (8th Cir. 2022), the following considerations when determining whether to excuse procedural default under *Martinez-Trevino*:

> (1) the claim of ineffective assistance of trial counsel was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the 'initial' review proceeding with respect to the 'ineffective-assistance-of-trial-counsel claim.'

*Id.* (internal citation and quotation omitted). While excuse of a claim under *Martinez-Trevino* does not require success on the merits, a threshold merits analysis must still be conducted to determine if a claim is "substantial" based only on the state court record (as opposed to "new" evidence not contained within it). *Shinn*, 596 U.S. at 389-90 (holding that federal district courts may not hold evidentiary hearings or consider any evidence outside of the state court record to assess cause and prejudice under *Martinez-Trevino*). A claim is substantial if it has "some merit." *Martinez*, 566 U.S. at 14. To demonstrate that an ineffective assistance of trial counsel claim is "'substantial,' [a federal habeas petitioner] must show that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Marcyniuk*, 39 F.4th at 996 (*citing Dorsey*, 30 F.4th at 757). To demonstrate prejudice, a petitioner need not show a reasonable probability of a different outcome, but instead must show

---

[11] In Nebraska, where a criminal defendant has different counsel on direct appeal, all known claims of ineffective assistance of trial counsel must be raised at their first opportunity, which is on direct appeal. *State v. Marshall*, 725 N.W.2d 834, 838 (Neb. 2007). However, where a defendant has the same counsel at trial and on direct appeal, their first opportunity to raise such a claim does not present itself until postconviction.

that his trial counsel's error "rendered his trial 'fundamentally unfair.'" *Id.* at 997 (*citing Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017)). "A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at 17.

C.    <u>Ineffective Assistance of Counsel Under *Strickland*</u>

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The second prong requires the petitioner demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Establishing that a state court's application of *Strickland* was unreasonable under AEDPA is all the more difficult. "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105. The Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009).

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

18

IV.     ANALYSIS

**Claim 1: *Propensity Evidence***

Ellis first argues that "[t]he admission of prejudicial evidence of Mr. Ellis' other crimes, wrongs, or acts under Nebraska Revised Statutes § 27-404, and the prosecution's use of that evidence to argue propensity, violated Mr. Ellis' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."[12] (Filing No. 1 at 16). This claim was exhausted on direct appeal, where the Nebraska Supreme Court determined that the Propensity Evidence, although improperly admitted at Ellis' trial, was not prejudicial due to the strength of the State's remaining evidence against him.

Ellis argues the Propensity Evidence was "highly inflammatory and prejudicial," and therefore the Nebraska Supreme Court's determination was contrary to or involved an unreasonable application of clearly established federal law. (Filing No. 1 at 2, 16-18, *citing* Filing No. 13-1 at 8-9). He alleges that because of the "close calls" on other evidence admitted at his trial, even in light of the evidence which was properly admitted, "[t]he admission of Mr. Ellis' other crimes, wrongs, or acts had a substantial and injurious effect or influence in deciding the jury's verdict" and "infected the trial with unfairness," depriving him of a fair trial in violation of his right to due process. (Filing No. 1 at 18, 27). For the following reasons, the court finds and recommends that this claim be denied.

To begin, Respondent asserts some preliminary arguments that should be addressed and which are rejected. Respondent argues, for example, that Claim 1 is not cognizable because this court cannot review whether the Propensity Evidence was properly admitted at Ellis' trial pursuant to state law. (Filing No. 60 at 5, fn. 2); *see Carson v. Director of the Iowa Dep't of Corr. Servs.* 150 F.3d 973, 975 (8th Cir. 1998). According to Respondent, Ellis should not be permitted to repackage a state law claim into a federal due process one. (Filing No. 26 at 21-22). The court declines Respondent's invitation to deny Claim 1 as a non-cognizable claim. The claim is exhausted and both parties acknowledge that a state court's evidentiary rulings may still be subject to some review under the due process clause if it was "so conspicuously prejudicial or of such magnitude as to

---

[12] The evidence Ellis refers to is evidence of his prior sexual assaults of Aisha and Aquanta previously defined as the Propensity Evidence.

19

fatally infect the trial and deprive the defendant of due process." (Filing No. 54 at 15; Filing No. 26 at 20-21, both citing *Parker v. Bowersox*, 94 F.3d 458, 460 (8th Cir. 1996)). Respondent next argues that even if Claim 1 raises a federal due process violation, there is no clearly established United States Supreme Court precedent holding that "the admission of evidence of other crimes, wrongs, or acts in the form of propensity evidence violates due process," making relief under AEDPA unavailable.  (Filing No. 26 at 21-22). The court rejects this argument too. In *Andrew v. White*, 604 U.S. 86, 93 (2025), the United States Supreme Court found "the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a criminal trial." The court will accordingly address the merits of Ellis' arguments.

### *Application of Brecht and AEDPA*

Ellis argues that the admission of other crimes, wrongs, or acts resulted in actual prejudice in his trial. He further argues that the Nebraska Supreme Court erred when it determined that the trial court's admission of Propensity Evidence was harmless. Respondent argues that Ellis would need to satisfy both the harmless error standard under *Brecht*, 507 U.S. 619, as well as the AEDPA standard under § 2254(d)(1), to prevail and he can do neither. *See Brown v. Davenport*, 596 U.S. 118, 133-34 (2022) ("Proof of prejudice under *Brecht* does not equate to a successful showing under AEDPA. Instead, the inquiries are 'entirely different in kind.'") (internal quotation omitted).

In *Brecht,* the Court addressed the standard for determining whether a constitutional trial error warrants relief on federal habeas review. The Court in particular rejected the use of the strict standard of review established earlier in *Chapman v. California*, 386 U.S. 18 (1967), which required a finding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Brecht,* 507 U.S. at 630. The Court recognized that while this standard may be appropriate on direct review, federal habeas proceedings are different. "[I]t hardly bears repeating that 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" *Id.* at 634 (*quoting United States v. Frady*, 456 U.S. 152, 165 (1982)). The Court then adopted the standard of review established in *Kotteakos v. United States*, 328 U.S. 750 (1946), to be used in habeas matters, which is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (*quoting Kotteakos*, 328 U.S. at 776)). This standard,

20

as the Court discussed, requires a showing of "actual prejudice," and is "better tailored to the nature and purpose of collateral review[.]" *Id.*

Under AEDPA, deference must be given to a state court's adjudication of both the law and facts. *See* 28 U.S.C. § 2254(d). Again, a federal court may grant a writ of habeas corpus only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[I]t is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006). And, "a constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003) (internal quotation and citation omitted).

The parties dispute what Supreme Court authority should apply to the specific issue here— the admission of prior bad acts evidence as a potential due process violation. (Filing No. 54 at 17; Filing No. 60 at 5). Another district court recently addressed a similar issue in *Bredemeier v. Phillips*, 2025 WL 1689306, at *9 (C.D. Cal. June 16, 2025) (emphasizing that a petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision"). As that court noted, to find a due process violation within the confines of a state court's evidentiary determinations depends on "properly admitted evidence" being "overwhelmed by a flood of irrelevant and highly prejudicial evidence that renders the trial fundamentally unfair." *Id.* (internal citation and quotation omitted). The court went on to point out that even applying a *de novo* review, "the chances of federal habeas relief on petitioners' evidence claims are exceedingly low. When AEDPA deference applies, however, those chances become vanishingly slim because petitioners' burden becomes doubly heavy", requiring a determination as to "whether a fairminded jurist could disagree that prejudicial evidence so infected a trial with fundamental unfairness to deny due process." *Id.* (internal citations omitted).

In carefully reviewing the record in this matter, the court concludes that a fair-minded jurist cannot disagree with the Nebraska Supreme Court's conclusion that notwithstanding potential trial court error, "the physical evidence, and statements Ellis was reported to have made before the physical evidence connected him to the crime, established his guilt beyond any reasonable

21

dispute." (Filing No. 13-1 at 9-10, 34 (internal citations omitted)). The Nebraska Supreme Court noted in particular some of the following:

> We recognize that the admission of other acts evidence, by its nature, is usually prejudicial to the defendant. But this is the rare instance in which it was not. For one thing, Shaffer testified, without objection, that Ellis admitted molesting young girls and impregnating his stepdaughter. And more fundamentally, Ellis was inescapably tied to Amber's killing through DNA evidence that, as we will explain below, was admissible and persuasive, and physical evidence that proved to be consistent with Ellis' careless statements that had already been reported to investigators. There was no innocent explanation for how Ellis' DNA came to be on Amber's bloody clothing. Nor is there any innocent explanation for how several witnesses came forward with information before Amber's body or Ellis' DNA on her clothing had been discovered linking Ellis to the killing—some of whom even accurately described Amber's cause of death and the possible location of her body. This evidence can only be explained by the conclusion that Ellis was the killer.
>
> Given Ellis' statements, the physical evidence, and the other circumstantial evidence, we have no doubt that any reasonable trier of fact would have found [Ellis] guilty of the charge against him. In particular, no reasonable trier of fact could overlook the testimony of Dennis, Smith, and Shaffer, each of whom was interviewed several weeks before Ellis' DNA was identified on Amber's clothing and at least a month before Amber's body was found in Hummel Park. Each witness found Ellis' interest in the case suspicious, and they all described details of the case that they had no way of knowing unless they heard them from the person who killed Amber. Therefore, although we find merit to Ellis' first assignment of error, we find that the error was not prejudicial to Ellis.

(Filing No. 13-1 at 9-10, 34) (internal citations omitted).

Certainly, it is difficult to imagine that the admission of some of the Propensity Evidence, including that Ellis previously threatened, harmed, and impregnated his two minor teenage stepdaughters, would not have some influence on a jury. But the analysis does not stop there because Ellis' description of this case as a "close" one is simply wrong. (*See* Filing No. 1 at 27). Reviewing for harmless error requires a court to consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (citing *Chapman*, 386 U.S. at 24). Whether errors in admission of evidence rise to a federal due process violation depends on "examination of the entire proceedings." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); cf. *Darden v. Wainwright*, 477 U.S. 168 at 178-81 (same for prosecutorial misconduct in argument).

22

Even without the Propensity Evidence, and as recognized by the Nebraska Supreme Court, the record shows that a fair-minded jurist would have found Ellis guilty of the crime charged. This evidence included, but was not limited to, testimony from witnesses detailing their discussions with Ellis concerning Amber's death and the location of her body. Ellis' odd infatuation with Amber's case before her body was even found and jailhouse calls in which Ellis indicated he needed to get out so he could find some stuff. Ellis' specific requests to corrections officers as to whether blood or semen left outside would be contaminated by the elements. Then there was the physical evidence discovered, including DNA evidence connecting Ellis to Amber's clothing, in particular DNA evidence found at "Area H2" and the random probability statistics associated with that finding. The Propensity Evidence did nothing to substantiate or invalidate the separate testimony of Dennis, Smith, and Shaffer or DNA experts Kaye Shepard, Dr. James Wisecarver, or CODIS (combined DNA index system) administrator Christine Moraczewski, or any other individual who testified at Ellis' trial. Nor did the admission of the Propensity Evidence make it any less probable that 11 markers of the DNA found in the DNA profile from Area H2 matched Ellis. The Propensity Evidence likely did little other than to confirm what the jury already determined from the other evidence presented—that Ellis was guilty of killing Amber.

While it is possible the jury may have drawn some inferences at trial from the Propensity Evidence (for example, that because Ellis had been convicted of assaulting young girls before, he was likely to have done so again). But this is not the standard to apply here, as Ellis must show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Given the substantial weight of the evidence presented against Ellis at trial, this burden has hardly been met. This is true even if applying a footnote from *Brecht* in which the Court noted that "[o]ur holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's finding." *Id.* at 638, n.9. Ellis emphasizes of course this comment, which appears to be *dicta*, but it has no bearing because this is not that type of case. As Respondent points out, the references to Propensity Evidence by the prosecutor during argument paled in comparison to the other evidence presented. "The prosecution's remarks in opening statement and closing argument comprised about six pages in an almost 2000-page trial transcript. The stepdaughters were two of forty-one witnesses the jury heard

23

during an eleven-day trial[.]" (Filing No. 26 at 24, *citing* Filing No. 13-22 at 217). Weighed against the other evidence presented, the outcome seemed clear regardless of the Propensity Evidence.

And further applying AEDPA, the court cannot find or recommend that the Nebraska Supreme Court's harmless-error review was objectively unreasonable. While that court did not specify in particular which harmless error standard applied, the state court's description of the standard was correct. (Filing No. 13-1 at 9). The state court did not act contrary to, nor did it engage, in an unreasonable application of clearly established federal law. Accordingly, this court recommends that Claim 1 be denied.

**Claim 2: *Pretrial Publicity***

Ellis next contends that "highly inflammatory pretrial publicity" prejudiced him during trial. He argues the trial court erred in failing to grant him a change of venue and that counsel was ineffective for failing to adequately support the change of venue motion with a "more representative sample of the prejudicial pretrial publicity." (Filing No. 1 at 31, 44-46). He submits that "there were more than 700 news stories that were prejudicial to [Ellis]," but trial counsel's "single-exhibit listing various headlines from the *Omaha World-Herald* to support their motion" did not address half of them. He argues that these issues were so objectively unreasonable and counsel's performance so deficient that his claim is a substantial one, even without an examination of the record. (Filing No. 54 at 19, *relying upon Irvin v. Dowd*, 366 U.S. 717, 722 (1961), *Rideau v. State of La.,* 373 U.S. 723 (1963), and *Skilling v. United States*, 561 U.S. 358, 382-84 (2010)). Ellis acknowledges that he did not raise these claims in his direct appeal nor in his postconviction proceeding, but he seeks to excuse his default, and also requests leave for further discovery on these issues and for an evidentiary hearing.

Respondent contends that Ellis' default cannot be excused under *Martinez-Trevino* as he failed to demonstrate a substantial claim. Respondent takes issue with the cases relied upon by Ellis and argues that a presumption of prejudice is reserved for "only the extreme case." (Filing No. 60 at 7, *citing Skilling,* 561 U.S. at 381). Respondent also argues that "the nature of [Ellis'] claim necessarily requires an examination of information outside the state court record, and therefore he must meet the stringent requirements of § 2254(e)(2), which he has not done." (Filing No. 60 at 7-13).

24

The court agrees that the evidence at issue was available long before Ellis' direct appeal and certainly his postconviction motion, therefore he has not shown sufficient *external* cause to excuse the default of his trial court error claim. *See Coleman*, 501 U.S. at 753. Nor has he satisfied the stringent requirements of AEDPA to warrant further discovery and/or an evidentiary hearing. Ellis in particular has not shown "a factual predicate that could not have been previously discovered through the exercise of due diligence," nor "clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty[.]" 28 U.S.C. §2254(e)(2). The court also finds the claims of ineffective assistance of counsel lack merit and are not substantial. For these reasons, as well as for the reasons set forth in the district court's Order denying the *Rhines* stay, (Filing No. 46), the court finds that Claim 2 is procedurally defaulted without excuse and recommends the claim be denied.

"'Just because…there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue.'" *Johnson v. Nix*, 763 F.2d 344, 347 (8th Cir. 1985) (*quoting United States v. McNally*, 485 F.2d 398, 403 (8th Cir. 1973), *cert. denied*, 415 U.S. 978 (1974)). Instead, a court assessing the effect of pretrial publicity must distinguish between largely factual publicity and that which is invidious or inflammatory. *United States v. Faul*, 748 F.2d 1204, 1212 (8th Cir. 1984). Straightforward reporting is factual, and objective reporting does not presumptively arouse lingering ill-will or vindictiveness in the local community. *United States v. Bliss*, 735 F.2d 294, 299 (8th Cir. 1984).

In *Skilling v. United States*, the Supreme Court addressed adverse publicity and prejudice and held that there is no presumption of prejudice "based primarily on the magnitude and negative tone of the media attention" as even "pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). The Court noted some of the following considerations: (1) the size and characteristics of the community in which the crime occurred; (2) that the pretrial publicity "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; (3) the time between the trial and the crime; and, (4) that the jury acquitted the defendant of nine of the counts charged. *Id.* at 381-85.

In *Irvin v. Dowd, supra,* the Court concluded there was a presumption of prejudice when some 268 of the 430 venire members were excused due to their fixed opinions as to the defendant's

25

guilt, almost 90% of those examined on the issue expressed some opinion as to the defendant's guilt, and 8 of the 12 jurors had formed an opinion that the defendant was guilty before the trial even began. *Id.* at 727-28. And in *Rideau v. State of La, supra*, prejudice was presumed when the local news station out of Calcasieu Parish (population of approximately 150,000 at the time) televised a 20-minute interview between the defendant and the local sheriff's department in which certain confessions had been made. The interview was broadcast to a wide area and seen by approximately 24,000 people the day after the robbery, 53,000 people the day after that, and another 20,000 people the following day. Three members of the selected jury confirmed in *voir dire* that they had seen the televised interview, and two members of the jury were deputy sheriffs from the same department. *Id.* at 724-27. The Court concluded that the community was "so pervasively exposed" that the state court proceedings amounted to "kangaroo court proceedings" and that the circumstances constituted prejudice warranting reversal. *Id.* at 726.

Here, Ellis fails to establish any of the criteria discussed in *Skilling* and his circumstances fall far short from those that existed in *Irvin* or *Rideau.* First, Ellis' trial took place in Douglas County, Nebraska, which is the most populous and diverse county in the state, with a population of approximately 500,000 residents at the time of trial.[13] Ellis does not argue or cite to any pretrial publicity that contained Ellis' confession or discussion of the case, or any information that could be considered "blatantly" prejudicial to him. In fact, as noted by Respondent, "reports on [Ellis'] criminal history, the DNA evidence, and Amber's bookbag were largely factual." (Filing No. 60 at 10, *citing* Filing No. 13-28); *see also Murphy v. Florida*, 421 U.S. 794, 802 (1975) (finding no prejudice in part because the newspaper articles were "largely factual in nature" and published some seven months before a jury was selected). Moreover, the time between the crime and Ellis' trial was over two years after Amber's disappearance and almost two years after her body was discovered, whereas the vast majority of the pretrial publicity cited by Ellis occurred in the years before Ellis' trial. (Filing No. 1 at 32-34, citing 2006 and 2007 television and print news stories). And, while Ellis argues that "[p]retrial publicity picked up in the days leading up to jury selection,"

---

[13] *See* Nebraska County Population, *Intercensal Estimates of the Resident Population for Counties of Nebraska: April 1, 2000 to July 1, 2010*, available at https://treasurer.nebraska.gov/tm/documents/rural-fire-district-mfo/2010/estimatedCountyPopulations2010.pdf (last accessed January 8, 2026); Nebraska.gov, *County Population by Ethnicity – 2010 Census*, available at https://dhhs.ne.gov/Reports/County%20Population%20by%20Race%20and%20Ethnicity%20-%202010%20Census.pdf (last accessed January 8, 2026).

he fails to detail the nature of that publicity, where it was aired, and who could have seen it. (Filing No. 1 at 34).

Ellis references multiple statements by prospective jurors about the publicity in *voir dire*, extrapolating that some 88% of the jury pool and 78% of the jurors selected reported having knowledge of the case from the pretrial publicity. (Filing No. 1 at 33-41). However, knowledge alone is insufficient to create a presumption of prejudice. The record shows that 25 of the 77 (32%) prospective jurors entertained some opinion as to Ellis' guilt, 21 of the 77 prospective jurors were excused for cause given those opinions, and none of the 14 selected jurors had formed an opinion as to defendant's guilt. (Filing No. 13-18 at 62-248; Filing No. 13-19; Filing No. 13-20 at 1-144). Ellis places specific emphasis on the pretrial publicity about his sexual assaults of his stepdaughters, but none of the selected jurors reported knowledge about that information. (*Compare* Filing No. 1 at 24-25 *with* Filing No. 13-20 at 195-96; Filing No. 13-18 at 127-28, 138-39, 187, 200, 220; Filing No. 13-19 at 28-29, 48, 155, 196, 208; Filing No. 13-20 at 25, 143-44, 182 (list of jurors and *voir dire* responses)). Accordingly, the trial court committed no error in denying Ellis' motion for a change of venue and, for similar reasons, trial counsel was not ineffective for addressing the issue(s) further.

**Claim 3: *DNA Evidence***

Ellis makes two broad assertions here: (1) that misleading and/or inadmissible DNA evidence was presented to the jury in violation of his rights under the Fifth and Fourteenth Amendments and *Brady v. Maryland*; and (2) that trial counsel rendered ineffective assistance of counsel in challenging the presentation of the DNA evidence in violation of his rights under the Sixth and Fourteenth Amendments. (Filing No. 1 at 46). He then divides his arguments into eight subparts (claims 3.1 to 3.8), alleging the prosecution presented substantially misleading and/or inadmissible evidence and then alleging ineffective assistance of counsel. (Filing No. 1 at 50-67). Ellis does not dispute that claims 3.1 to 3.6 were not raised on direct appeal, but he asserts there is cause and prejudice to excuse any procedural default. He argues the claims are substantial and have "some merit" and it is at least debatable that trial counsel was ineffective. The parties either agree, or the district court already found, that all subparts of Claim 3 are procedurally defaulted. (*See* Filing No. 26 at 32; Filing No. 37 at 4; Filing No. 46; Filing No. 54 at 22-23). Therefore, to proceed on the merits, the procedural default must first be excused.

*Claims 3.1, 3.2, 3.3, 3.4, 3.5, 3.6*

Ellis argues that "the state collateral review proceeding was the initial review proceeding for ineffective assistance of trial counsel claims." (Filing No. 54 at 22-23). Accordingly, he alleges that cause and prejudice exists to excuse the procedural default of these claims under *Martinez-Trevino*. However, those claims are for prosecutorial misconduct, not ineffective assistance of counsel, therefore *Martinez* does not apply. Moreover, each of the allegations supporting these claims were, or should have been, known to Ellis and his counsel prior to filing the direct appeal. The court can find no *external* impediment preventing the filing of those claims. Therefore, there is no basis to excuse the procedural default and the claims should be denied.

Ellis makes additional arguments as to Claim 3.2, first challenging the propriety of DNA "match" results, and then arguing his default may be excused under *Brady*. He argues in particular that the prosecution misled the jury when it presented evidence and testimony as to a CODIS "match," without disclosing a statistical analysis of the comparison between the DNA sample provided and the CODIS database sample. (Filing No. 54 at 23-26).[14] The prosecutor instead only disclosed a one-page "Match Report" implicating Ellis. He relies upon state law for the proposition that DNA evidence may not be admitted without supporting statistics. (Filing No. 1 at 53, citing to *State v. Carter*, 524 N.W.2d 763 (Neb. 1994) (*overruled in part by State v. Freeman*, 571 N.W.2d 276 (Neb. 1997)). But errors of state law are not cognizable in federal habeas courts. *See Nance v. Norris*, 392 F.3d 284, 289 (8th Cir. 2004). Ellis does not allege any constitutional principle or authority from the United States Supreme Court or other federal court mandating that DNA evidence must always be accompanied by a statistical analysis to be admissible.

---

[14] For context, DNA analyst Kaye Shepard testified that in May 2006 she found an area on the leg of Amber's jeans she designated as "Area H," which had a partial mixed DNA profile. The area was considered "inconclusive", and no statistical report was prepared. In a second inspection, Shepard found an area near the hem of the leg of the jeans she designated as "Area H2." This area contained a mixed DNA profile and it was determined that at least one contributor was male. (Filing No. 13-24 at 211). On May 16, 2006, CODIS administrator Christine Moraczewski searched the partial DNA profile against the state DNA database, or CODIS, which contained profiles from convicted offenders in the state. (Filing No. 13-24 at 54-55). This process resulted in a match to a convicted offender by number, who was later identified as Ellis. In June 2006, Shepard obtained a reference sample from Ellis and compared the reference to both the partial profile at Area H and Area H2. (Filing No. 13-24 at 213-14). The Area H results were inconclusive, but it was concluded that Area H2 contained a possible mixture between Ellis and Harris. (Filing No. 13-24 at 221). Shepard then ran the numbers to obtain the probability of an individual other than Ellis matching a partial DNA profile found within the mixture. (Filing No. 1 at 48 and Filing No. 13-24 at 194-225).

In the alternative, Ellis captions this claim as a discovery violation under *Brady v. Maryland*, arguing that the prosecution allegedly withheld statistical data for the CODIS "match" presented at trial. (Filing No. 54 at 23-26). He argues in particular that the State presented the testimony of CODIS manager Christine Moraczewski, who testified that she took the partial DNA profile from area H2 and searched it against profiles in the state DNA database, which resulted in a match to Ellis. According to Ellis, the State failed to disclose the underlying CODIS data showing an assessment of the comparison between his CODIS profile and the DNA profile. (Filing No. 1, at 54). It is well-established under *Brady* that the prosecution has an affirmative obligation to disclose evidence it knows to be exculpatory and favorable to a defendant's case. *Brady*, 373 U.S. at 86. Ellis notes that *Brady* claims can provide their own cause and prejudice where "the material in question was not discovered until after the deadline for presenting the claim to the state courts." (Filing No. 54 at 23, *citing Hall v. Luebbers*, 296 F.3d 685 (8th Cir. 2002)). Cause in the *Brady* context is demonstrated by the willful or inadvertent suppression of evidence through state action. *Strickler*, 527 U.S. at 276, 281-82. Prejudice is demonstrated when the suppressed evidence is "material" for *Brady* purposes. *Banks v. Dretke*, 540 U.S. 668, 671 (2004).

There is no evidence in the record to show that the evidence at issue existed or was suppressed through any state action. Moreover, the alleged deficiencies were known, or should have been known, at the time of discovery and long before trial. This particular issue should accordingly have been raised on appeal and certainly in the First PCM. There is also no showing of materiality or prejudice. Witnesses testified that the "match" between the CODIS profile and the mixed DNA profile at Area H2 was just a preliminary step. Ellis' buccal swab was tested against the DNA profile at H2 and that information was used to reach the statistical probability presented at trial. (Filing No. 13-24 at 214). In rejecting other DNA arguments that were raised through postconviction, the Nebraska Supreme Court concluded that the probability evidence that was presented, albeit "'relatively modest' compared to some cases… strongly suggested that Ellis' DNA was likely on Harris' jeans." (Filing No. 13-3 at 16). That court went on to concluded that "[c]onsidering this with the other circumstantial evidence that Ellis killed Harris, . . . we find there is not a substantial likelihood that the outcome would have been different had the probability statistic's relative strength been more overtly pointed out to the jury." (Filing No. 13-3 at 16).

This same reasoning applies here. Even if a separate statistical analysis for the CODIS match was created, or should have been disclosed, the court cannot conclude there was a *Brady* violation as the evidence was not exculpatory or favorable to Ellis' defense. While Ellis concludes that the statistical analysis "would have impeached the conclusory testimony of [the CODIS Administrator] that there was a CODIS match," (*see* Filing No. 1 at 54), he fails to identify any inaccurate information in the Match Report he received or otherwise explain how additional documentation would have undermined the results. For these additional reasons, the court recommends Claim 3.2 be denied.

*Claim 3.7*

Ellis argues that cause and prejudice exists to excuse his procedural default because his trial counsel was ineffective for failing to adequately object to and challenge the alleged misleading and inadmissible evidence referenced in Claims 3.1 to 3.6. As previously discussed, there is no excuse for those procedural defaults, so the merits are outside of this court's review. Notwithstanding, the court has reviewed Ellis' arguments to determine whether trial counsel's failure to object supports a finding that Claim 3.7 is a substantial claim under *Martinez-Trevino* and finds that it is not.

Ellis argues Claim 3.7 is substantial and has "some merit" because defense counsel had a basic obligation to know the rules of evidence. He argues trial counsel failed to object to the presentation of certain DNA evidence, leaving the jurors to "the only conclusion" that Ellis had handled Amber's jeans, that trial counsel failed to object to misleading DNA statistics, and that trial counsel did not adequately counter the state's expert regarding secondary or tertiary DNA transfer. He argues trial counsel's performance fell below the objective standard of reasonableness under *Strickland*, and if counsel had challenged the State's evidence, there is a reasonable probability that the outcome of his trial would have been different. (Filing No. 54 at 28). These arguments will be addressed in turn and are each rejected.

First, Ellis argues his trial counsel did not object to repeated elicitation of expert testimony that he was not excluded as a contributor to the DNA evidence. Kaye Shepard testified that there was a male contributor to the DNA profile found at Area H and Area H2. (Filing No. 13-24 at 207, 211). The Nebraska Supreme Court has found that the presence of male DNA in a case involving an alleged sexual assault of a female victim is probative and admissible even if the DNA is of

insufficient quantity or quality to obtain a statistical profile. *See State v. Wood*, 966 N.W. 2d 825 (Neb. 2021) (concluding that because such testimony is admissible, defense counsel was not deficient at trial for failing to object to it). In this case, beyond the presence of male DNA, witnesses testified that Ellis could not be excluded as a contributor because there was not enough of Ellis' type, alleles, or markers to run conclusive statistics. (Filing No. 13-24 at 206-07, 213-144 (Kaye Shepard); Filing No. 13-25 at 42 (Dr. James Wisecarver)). This testimony is far from Ellis' assertion that "the only conclusion the jury could have drawn from the evidence" was that Ellis was the individual who had handled Amber's clothing.

Moreover, a review of the record demonstrates that the witnesses provided probability statistics, at least for Area H2. Kaye Shepard testified as follows: "When I ran the numbers, the probability of an unrelated individual matching a partial DNA profile found within the mixture given that Roy Ellis expresses such a profile is 1 in 2.63 billion Caucasians [] 1 in 2.36 billion African Americans, and 1 in 4.32 American Hispanics." (Filing No. 13-24 at 224-25). Ellis invokes the so-called "prosecutor's fallacy," or an erroneous assumption that a random match probability is the same as the probability that the defendant was not the source of the DNA sample. *See McDaniel v. Brown,* 558 U.S. 120, 128 (2010). But Shepard and Wisecarver testified in terms of the rarity of the DNA profile and the probability of finding a person other than Ellis who would have that DNA profile, using the actual statistics. This testimony does not implicate the prosecutor's fallacy. Further, the Nebraska Supreme Court again described the probabilities in this case concerning the DNA mixture as "relatively modest" compared to other cases, which went to the weight of the evidence and not its admissibility. (*See* Filing No. 13-1 at 13; Filing No. 13-3 at 12).

Additionally, Ellis asserts his trial counsel did not object to the prosecution's repeated description of the "handprint" at Area H2, arguing that the jury could only have concluded that Ellis had pulled Amber's jeans off. However, trial counsel did object on foundation and speculation grounds when Shepard testified "To me [Area H2] looked like a handprint" and the objection was overruled. (Filing No. 13-24 at 208-209). Shepard, even when testifying as an expert, is permitted to provide a lay opinion of her perception pursuant to Fed. R. Evid. 701, i.e. that the markings on the jeans looked like a handprint to her. *See United States v. Watkins*, 127 F.4th 1142 (8th Cir. 2025); *see also Neb. Rev. Stat.* § 27-702. When the prosecution continued to refer to the

"handprint," trial counsel did not object, but the jury had a photograph of Area H2 and could independently determine whether the shape in the photograph looked like a handprint. (*See* Filing No. 23-3).

Finally, Ellis acknowledges that his counsel did raise the issue of secondary or tertiary DNA transfer, but claims they were not prepared to counter Dr. Wisecarver's incorrect testimony about DNA transfer. Wisecarver's testimony was supported by scientific studies. Trial counsel also appropriately inquired on cross-examination as to whether there was any way to tell in a lab how genetic material got onto a particular evidentiary item, and he answered "[t]here's no way to tell." (Filing No. 13-25 at 57). Ellis' bare assertion that Wisecarver's testimony was incorrect is not a substantial claim and his counsel established that there is no way to determine with 100% certainty how the DNA at Area H or H2 was deposited and by whom. The court accordingly recommends that this claim also be denied.

### *Claim 3.8*

In his next claim, Ellis alleges that his trial counsel was ineffective by repeatedly stating an incorrect DNA statistic to his detriment. Specifically, he argues his claim is substantial as trial counsel mistakenly referred to the "1-in-2.36 billion" random probability statistic previously discussed in Claim 3 as "1 in 2.63 billion." (Filing No. 54 at 31). He argues that this error made it more likely that the DNA came from Ellis and argues that but for this error the result of his trial would have been different. (Filing No. 54 at 32). But the court finds this claim to be insubstantial because when considering a probability of over 1 in 2 billion, the difference between 2.36 and 2.63 is not material and would not affect the outcome of trial. (Filing No. 60 at 18). If the jury was confused, the jurors were able to correct any misunderstanding by reviewing the evidence submitted or by asking for clarification. There is accordingly no basis to excuse the procedural default of Claim 3.8 under *Martinez-Trevino* and the claim should be denied.

### Claim 4: *Jailhouse Informants*

Ellis argues that the admission of testimony from jailhouse informants Dennis and Chambers violated his rights under the Fifth, Sixth, and Fourteenth Amendments. (Filing No. 1 at 67-68). As to Dennis, the claim was exhausted in state court and may be addressed on the merits. Ellis does not dispute, however, that his claim concerning Chambers was not presented to the state

court and is procedurally defaulted, although he argues the default should be excused. The court rejects both claims for the following reasons.

The basic legal principles that apply here are well-established. *See Brady v. Maryland* (1963); *see also United States v. Agurs*, 427 U.S. 97 (1976). Prosecutors again have an affirmative obligation to disclose evidence favorable to the defense. Failure to disclose material evidence may constitute reversible error. *See Giglio v. United States*, 405 U.S. 150, 154-55 (*Brady* requires the government to produce all material evidence, whether impeachment or exculpatory, in its possession that is favorable to the defendant); *Tyler v. Frakes*, 2020 WL 4922195, at *13 (D. Neb. Aug. 21, 2020) (same). "Material" evidence is that which "creates a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112.

This requirement of course also applies to jailhouse informers, defined by Nebraska statute as "a person who offers testimony about statements made by a suspect or defendant while the suspect or defendant and jailhouse informant were in the custody of any jail or correctional institution and who has requested or received or may in the future receive a benefit in connection with such testimony." *Neb. Rev. Stat.* § 29-4701(2).[15] The statute further imposes upon the prosecutor certain disclosure obligations for jailhouse informers, including the disclosure of known criminal history of the informant, any benefit requested or offered to the informant, other cases in which the informant testified in the same capacity, and any occasion in which the informant recanted prior testimony about statements. *Neb. Rev. Stat.* § 29-4704; *see also Giglio,* 405 U.S. at 154-55 ("[t]he prosecution must disclose to the defense an agreement with a witness ... that may motivate the witness to testify and may affect the outcome of that trial").

In this matter, Ellis argues the prosecutor relied upon the testimony of jailhouse informers Dennis and Chambers at trial and suppressed plea deals with both of them. He again acknowledges that his claim as to Chambers is procedurally defaulted. (Filing No. 1 at 67-72; Filing No. 54 at 36). He seeks relief for that default under *Brady v. Maryland*, arguing that the suppression of exculpatory evidence through state action provides sufficient cause. (Filing No. 54 at 36, *citing Strickler*, 527 U.S. at 276; *Banks,* 540 U.S. at 692)). Ellis argues in particular that the State's refusal

---

[15] As noted earlier herein, *supra* at n.2, the trial court applied an earlier version of the statute that defined a jailhouse informer as only one who was "in custody." Because Dennis (and Martin) were no longer in custody at the time the issue was decided, although they were in custody at the time of the purported statements, the trial court concluded they did not qualify as jailhouse informers. (Filing No. 13-14 at 132).

to disclose any deal with Chambers was an "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." (Filing No. 54 at 24, *citing Murry v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Coleman*, 501 U.S. at 753. But the record does not support Ellis' contentions. (Filing No. 26 at 38, n. 11, citing Filing No. 13-18 at 34-35; Filing No. 13-23 at 171-83; Filing No. 13-29)).

As Respondent points out, there is no evidence in the record that Chambers had any plea deal that should have been disclosed. While it appears the witness testified at trial that he was hoping to receive something in exchange for his testimony, there is nothing in the record that shows that any offers had been made or were received. (Filing No. 26; Filing No. 30 at 38, fn. 11, with record citations). Ellis points out that Chambers' separate federal sentence was reduced significantly just a few months after trial, but he makes no citation to the record to support that assertion. Moreover, Ellis was permitted to cross-examine Chambers at trial and specifically inquired as to what benefits he was receiving in exchange for his testimony, meaning the jury was free to consider that possibility and his credibility. Chambers responded that while he hoped for some future consideration, nothing had been promised to him and that he essentially volunteered. (Filing No. 13-23 at 171-83). Ellis now seeks additional discovery in hopes of finding proof of a deal that existed between Chambers and the State, but he fails to satisfy the stringent requirements of AEDPA for further factfinding or an evidentiary hearing with this court. *See* 28 U.S.C. §§2254(e)(2)(A)(i) and (ii). Nor has he established by clear and convincing evidence that no reasonable factfinder would convict him regardless. 28 U.S.C. § 2254(e)(2)(B). The court accordingly finds that this is not a substantial claim for purposes of excusing Ellis' procedural default and recommends that this claim be denied as defaulted.

Although Ellis' similar claim as to Dennis was exhausted, it fares no better. Ellis argues that the State had reached a plea agreement with Dennis in exchange for his testimony at trial that was never disclosed. In rejecting this claim on direct appeal, the Nebraska Supreme Court concluded as follows:

> The only point Ellis makes on appeal that appears to relate to prejudice is that after his testimony at trial, Dennis entered into a plea agreement for some charges that had been pending against him. But there is no evidence that the plea agreement had been reached, or contemplated, at the time Dennis testified. In other words, nothing in the record is contrary to the district court's express finding, in ruling on Ellis' motion to exclude testimony, that the relevant statutes were substantially complied

34

> with. The court did not abuse its discretion in rejecting Ellis' motion, and we find no merit to Ellis' assignment of error.

(Filing No. 13-1 at 11). Ellis takes issue with this conclusion, in particular the state court's finding that no prejudice resulted in the purported *Brady* violation. (Filing No. 1 at 70-72, citing *Strickler*, 527 U.S. at 281-82). However, his argument again relies on a presumption that an agreement between Dennis and the State existed at the time he testified, which it did not. *See Agurs*, 427 U.S. at 109-10 ("[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense").

This Court must defer to the state court's factual findings, which are presumed correct unless Ellis rebuts that presumption by clear and convincing evidence. *See Rice v. Collins*, 546 U.S. 333, 338-39 (2006); *see also de la Garza v. Fabian*, 574 F.3d 998, 1002 (8th Cir. 2009). "Whether the State made deals with [a witness] is a factual question entitled to the presumption of correctness unless the petitioner can clearly and convincingly show otherwise." *Dye v. Stender*, 208 F.3d 662, 665 (8th Cir. 2000). Ellis has not met this burden. The prosecutor was adamant prior to trial that the State did not have any deal or even any "secret" deal with Dennis for his testimony. (Filing No. 13-18 at 34-35; Filing No. 13-29). The prosecutor maintained that position after the trial's completion. (Filing No. 13-26 at 131-37). Dennis also testified at Ellis' trial that he had not been promised anything for his testimony, and although he was hoping for some consideration, he would have done "this one on the house" because "it's a child." (Filing No. 13-22 at 163, 184-85).

And even if the record raises some inference that a deal may have been in the works, this too is not enough because the determining factor is whether a plea or cooperation agreement was made *before* a defendant's trial. *See Dye*, 208 F.3d at 665; *see also United States v. Molina*, 75 F.3d 600, 602 (10th Cir. 1996) (noting that "[r]equiring the government to disclose *potential* plea agreements and offers of plea agreements would place an unreasonable burden on the government, and such offers are too speculative and uncertain to be material") (emphasis added); *United States v. Ramirez*, 608 F.2d 1261, 1266-67 (9th Cir. 1979) (the record was void of any evidence that an agreement had been reached at the time of the witness' testimony which was not disclosed to the jury). Where there is no evidentiary basis for finding the existence of a deal that should have been disclosed to the defense, there is no *Brady* violation.

35

Like Chambers, Dennis testified that while he hoped he might receive some benefit in exchange for his testimony, there were no promises. (Filing No. 13-22 at 163). But this also is not enough. *See Dye*, 208 F.3d at 666 (a witness's hope that his cooperation might help in a separate federal sentencing is not clear and convincing evidence of inducement). Ellis' trial counsel also had an opportunity to cross-examine Dennis about any potential inducement and it appears, as noted by the trial court, that the state disclosed "Dennis's NCIC and local record printouts" and informed Ellis by letter than he had not "been promised any benefit for [his] testimony." (Filing No. 13-14 at 133). The Nebraska Supreme Court concluded that there was nothing in the record to contradict the express finding by the trial court that the relevant statutes had been "substantially complied with" and there was no prejudice for any deficiencies. (Filing No. 13-1 at 11). These findings are also presumed to be correct and have not been rebutted.

For these reasons, the court finds that Ellis has failed to show either that the decision of the Nebraska Supreme Court was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, or was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. As such, this Court recommends Claim 4 as to Dennis also be denied.

**Claim 5: *Mitigation Evidence***

Ellis alleges that his trial counsel was ineffective when it failed to adequately investigate his personal background and, as a result, failed to uncover and present potentially compelling mitigation evidence for use at the penalty phase. (Filing No. 1 at 73-83). According to Ellis, such evidence should have included more information about his social history, his behavior during prior prison terms, his IQ, his prior treatment and psychiatric health, and the impact of his execution on his family members. (Filing No. 1 at 79-83). Ellis admits that these claims were not raised in his first postconviction motion, but seeks to excuse any procedural default under *Martinez-Trevino* and *Marcyniuk*, 39 F.4th at 996. (Filing No. 54 at 40). Respondent argues that Ellis cannot establish any prejudice from his counsel's alleged investigatory failures because he failed to show how any of it would have made a difference in the panel's determination, especially considering the aggravating factors found by the jury. (Filing No. 26 at 43).

The court finds that the claim is procedurally defaulted and the default is not excused. Ellis acknowledges that he did not raise these issues in the First PCM, although he has now raised them

36

in his Second PCM. The district court, however, denied Ellis' request for a stay, concluding that his efforts to raise those issues now in state court is futile as state law "forbids successive postconviction motions for ineffective assistance of trial counsel claims that could have been but were not brought previously." (Filing No. 46 at 21). As the court further noted, "[t]here is no reason to believe that the Nebraska courts or legislature have any intention to change procedural rules in a way that would permit review of Petitioners Unpresented [Ineffective Assistance of Counsel] Claims." (Filing No. 46 at 21).

Ellis also cannot show cause or prejudice to excuse his default as the issues now raised were known long ago. While Ellis argues that there was additional information gleaned from the presentence investigation reports and other materials that warranted further investigation, there is no good reason as to why Ellis could not have made those arguments when he filed his first postconviction motion. And although he wishes to expand the record with additional information provided in his Second PCM (including a neuropsychological report prepared by Dr. Robert Schaffer), the district court already noted that none of that information is new. (Filing No. 46 at 15) ("The information relied upon by Dr. Schaffer in rendering his opinions, including treatment notes and other records relating to Petitioner's mental health care starting from when Petitioner was in high school in 1970, was similarly available. Moreover, Petitioner's mental health history was raised both during [his] sentencing and postconviction proceedings"). And as the Respondent points out, the sentencing panel specifically noted that it had considered Ellis' presentence investigation report in evaluating the mitigation factors. (Filing No. 26 at 42; Filing No. 30 at 42 citing Filing No. 13-32 at 115). The presentencing investigation report from which Ellis has gathered his "new" mitigation evidence was made part of the record considered by the panel. (Filing No. 26 at 42-43; Filing No. 30 at 42).

Ellis also has failed to show a substantial claim of ineffective assistance of counsel sufficient to overcome his procedural default. Capital defense counsel is obliged to "conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present," but there is no requirement that they use the evidence obtained. *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010) (*citing Williams*, 529 U.S. at 396). "In other words…counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S.

37

at 691, but is under no obligation to "scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Instead, "failing to present mitigating evidence may be ineffective assistance if, due to inadequate trial preparation and investigation, 'counsel has through neglect failed to discover such evidence.'" *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991) (*quoting Laws v. Armontrout*, 863 F.2d 1377, 1385 (8th Cir. 1988)). To determine whether counsel's investigation was ineffective, the court must look to "norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *See Rompilla*, 545 U.S. at 380-81. [16]

### Family Members

Ellis takes primary issue with his trial counsel's purported failure to investigate his background further and present that information during the sentencing phase. He argues, for example, that trial counsel failed to interview his family members who could have provided some favorable mitigation evidence or to consider the impact of his execution on those family members. He references again the presentence investigation report, which he believes contained evidentiary leads that should have been followed. But "[t]o establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony 'would have probably changed the outcome of the trial.'" *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996) (*quoting Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994)). No such showing was made. And Ellis ignores that his attorneys tried to locate family members to prepare his defense, but were unsuccessful in "get[ting] in touch with any other family members who had any of that sort of knowledge." (Filing No. 13-33 at 21). Ellis does not provide the names of any hypothetical witnesses.

The record also does not identify any potential witnesses. In one presentence interview, Ellis stated that his father was deceased, he had not seen his biological mother in 25 years, his stepmother who raised him was also deceased, he last saw his sister in 1993, and he only met his

---

[16] Prevailing professional norms, as referenced by Ellis, are discussed both in legal decisions and the ABA Guidelines for death penalty counsel (the ABA Death Penalty Guidelines"). (Filing No. 54 at 40, *citing Slocum v. Kelley*, 854 F.3d 524, 532 (8th Cir. 2017); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Kemp v. Kelley*, 924 F.3d 489, 501 (8th Cir. 2019); *Williams*, 529 U.S. at 396)).

brother on one occasion. (Filing No. 12-1 at 52). Further, while a Classification Study from 1995 indicated Ellis had five other siblings (Filing No. 12-2 at 125-26), he did not discuss any of them during his presentencing interview and their whereabouts were unknown. (Filing No. 12-1 at 53). The court cannot speculate that any of Ellis' family members were willing to openly testify about family history, prior asserted abuse or neglect, and/or whether the information would have been helpful to Ellis as mitigation evidence.

### *Prior Prison Behavior and Intellectual Functioning*

Ellis next argues that his trial counsel failed to adequately investigate his prior behavior while incarcerated or his intellectual functioning. As to the first issue, Ellis speculates that had the sentencing panel been informed of his prior prison behavior—to show that he was able to sufficiently handle prison life--the panel may have decided differently. This argument makes little sense as Ellis was already serving a significant sentence at the time for a prior conviction and the panel was well aware of his criminal history. It is certainly not clear how any mitigation evidence could be obtained as he was going to remain incarcerated for a significant period of time regardless. It goes too far to suggest that the sentencing panel somehow found the death penalty more appropriate because Ellis could not handle an alternative life sentence.

As to his intellectual functioning, Ellis argues that his trial counsel failed to arrange an IQ (Intelligence Quotient) assessment or competency test. A review of the record, however, establishes that Ellis' IQ was taken on March 26, 1999, by Drs. Y. Scott Moore and Mario Scalora at the Lincoln Regional Center, which indicated he had a verbal IQ of 59, performance IQ of 59, and full-scale IQ of 55. (Filing No. 13-32 at 170). The doctors noted those scores were inconsistent with Ellis' level of daily functioning and history and they therefore considered them invalid, believing Ellis "presented himself in a manner that would exaggerate his symptoms." (Filing No. 13-32 at 170). A Classification Study performed in 1995 found Ellis to be of average intelligence. (Filing No. 12-1 at 56; Filing No. 12-2 at 127). Notably, Ellis does not use the 1999 IQ test as support for any intellectual impairment nor does he argue that the results were valid. Nor does he refute that his counsel and the sentencing panel were well aware of the information during the penalty phase of the case. His psychiatrist Dr. Bruce Gutnik addressed the IQ test at the sentencing hearing and confirmed that "the bottom line was his tested IQ was lower than his perceived level of functioning on the unit and it was felt that he was trying to exaggerate the symptoms." (Filing

No. 13-32 at 39). Dr. Moore also testified about the test at the sentencing hearing, confirming that he concluded the results were invalid because Ellis "was attempting to look worse than he really was." (Filing No. 13-32 at 88).

The evidence is also clear that his trial attorneys carefully considered his mental functioning as part of the mitigation proceedings. Indeed, Dunn testified at the post-conviction evidentiary hearing that the defense advanced arguments addressing Ellis' mental health or mental status during the sentencing proceeding. (Filing No. 13-33 at 21-23). But his counsel simply did not believe, after speaking with Ellis "many, many times[,]" that they could fashion any sort of trial defense" based upon insanity or competency. (Filing No. 13-33 at 23) ("Mr. Hug and I had discussed having him evaluated for competency/insanity. And between the two of us, we just didn't see any evidence of it. So the thought from there was to address it on a non-statutory mitigator theory at the time of sentencing"). The primary goal for purposes of sentencing then was to establish that Ellis "had suffered for a long period of time from psychiatric and mental difficulties and that that was something that should be considered in mitigation of his sentence." (Filing No. 13-33 at 22). That evidence was presented. The decision to forego a new IQ test is not evidence that Ellis' mental functioning was ignored, but instead supports a finding that counsel determined it need not (or should not, for fear of the results) be undertaken in light of other evaluations. *Hannon v. Sec'y, Dep't of Corr.*, 622 F. Supp. 2d 1169, 1188 (M.D. Fla. 2007) (explaining that counsel's performance is not ineffective where "trial counsel viewed evidence of mitigating circumstances as fundamentally damaging to the integrity of his client's case"), *aff'd*, 562 F.3d 1146 (11th Cir. 2009).

### *Other Mental Health Records*

Ellis next argues that his trial counsel failed to obtain reasonably available records related to his psychiatric health and prior treatment. In particular, Ellis takes issue with his counsel's sole reliance upon Dr. Gutnik's testimony at the sentencing hearing as well as counsel's purported failure to obtain more social security records, records of prescription drugs, military records, school records, or others. These arguments are belied by the record.

Ellis contends that the presentence report indicated he had received Social Security disability for schizophrenia since the 1990s. (Filing No. 1 at 77). But his attorney Dunn specifically addressed this issue and explained that he was aware of this issue and their efforts to "track down"

those particular records were unsuccessful. (Filing No. 13-33 at 20). Moreover, the sentencing panel was well-aware of the diagnosis of schizophrenia and it did not need the Social Security records to establish the same thing. Ellis' psychiatrist Dr. Gutnik spoke about it at length during the sentencing hearing, and so too did the State's witness Dr. Moore. There were also a number of prior evaluations and reports offered at the sentencing hearing that addressed schizophrenia. (*See e.g.* Filing No. 13-32 at 12, 18, 158, 177, 181, 183 188, 190, 196). To the extent the sentencing panel may have found evidence of Ellis' malingering more persuasive, or that much of Ellis' symptoms were self-reported, is not evidence that his trial counsel was ineffective in addressing the issue.

The same is true for the plethora of other records Ellis now believes should have been obtained, including other treatment records, military, or school records. The arguments are speculative and it is not clear what additional information could be gleaned from them. Dr. Gutnik confirmed that he took Ellis' complete mental health history into consideration as part of his diagnoses. (Filing No. 13-32 at 154-177). The sentencing panel specifically addressed both statutory and non-statutory mitigation factors and carefully considered the evidence presented, including his mental health history. After doing so, the panel concluded that Ellis did not meet certain mitigating criteria in that he was not acting under extreme mental or emotional disturbance at the time of the crime, nor did the evidence support that he was unable to appreciate the wrongfulness of his conduct. (Filing No. 13-33 at 136-41).

The panel considered specifically Ellis' history of mental health problems, had extensive testimony and records available concerning those issues, and still assigned minimal weight to his mental health history as a non-statutory mitigation factor. And certainly these issues cannot be viewed in a vacuum, as the sentencing panel was also required to balance any mitigating factors with the aggravating ones, which were extensive. As Respondent reminds us (Filing No. 26 at 45; Filing No. 30 at 45), Ellis abducted a 12-year old girl on her way home from school. He took her to an isolated wooded location and sexually assaulted her, struck her on the head taking her life, and then disposed of her body. He discarded her bookbag and bloody clothing and then essentially bragged to his fellow inmates about the crime. The court agrees that the issues here are not "debatable among jurists of reason." *See Marcyniuk,* 39 F.4th at 996. Applying the same reasoning the Supreme Court used in *Strickland*, Ellis cannot show his counsel was deficient because there

were overwhelming aggravating factors and the evidence that Ellis says his trial counsel should have offered at the sentencing hearing would "barely have altered the sentencing profile presented to the sentencing judge." *See e.g. Strickland*, 466 U.S. at 699-700. For these reasons, the court cannot find that trial counsel acted through neglect in preparing for the sentencing phase of Ellis' capital trial and he has not established a claim for ineffective assistance of counsel, much less a substantial one sufficient to excuse any procedural default. The court accordingly recommends that Claim 5 be denied.

**Claim 6: *Plea Negotiations***

The court makes the same recommendation for Claim 6, in which Ellis argues his trial counsel was ineffective in not taking reasonable steps to negotiate a sentence less than death and not diligently pursuing a plea deal with the State. The claim was not raised in Ellis' First PCM and is procedurally defaulted. Ellis has not established a substantial claim of ineffective assistance of trial counsel in excusing his default. As the district court already concluded, his efforts to now raise the issue in his Second PCM are futile as the motion is procedurally and time barred.

While a defendant is entitled to effective assistance of counsel during plea bargaining, *Missouri v. Frye*, 566 U.S. 134, 143 (2012), a criminal defendant has "no right to be offered a plea." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). Moreover, "[c]ounsel is not responsible for the prosecution's decision not to tender a particular offer." *Thibodeau v. Artis*, 2022 WL 3145961, at *4 (E.D. Mich. Aug. 5, 2022); *see also United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984) ("[T]he Sixth Amendment does not require that counsel do what is impossible…."). And, "[w]ithout evidence that the prosecution would have offered a favorable plea, a petitioner cannot show that he was prejudiced by counsel's failure to secure a favorable deal." *Thibodeau* at *4 (*citing Frye*, 566 U.S. at 147-49); *see also Johnson v. United States*, 860 F. Supp. 2d 663, 789–90 (N.D. Iowa 2012) (the relevant inquiry is whether "the prosecution ever formally offered a plea agreement that the petitioner could have accepted") (*citing Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000)).

Ellis has not shown that his trial attorneys failed to negotiate with the State, nor has he shown that the State was willing to extend a favorable plea offer in this matter. His arguments are ripe with speculation as to what would have, could have, and should have been. The record undermines Ellis' argument that if the State had been made more aware of his mental health history,

42

there may have been a favorable plea offer. The original charging document placed Ellis on direct notice that the State was seeking the death penalty and the reasons why. The State had in its possession much information about Ellis' prior criminal history and his mental health history. As Respondent points out, there was likely little incentive for the State to negotiate given the "overwhelming evidence of guilt." (Filing No. 26 at 46; Filing No. 30 at 46). Moreover, Ellis was already serving what was effectively a life sentence for another prior crime, undermining his argument that the State might have been willing to negotiate the same thing in this case for a new and even more severe violent crime.[17]

Ellis attempts to expand the state court record, relying on an interview statement purportedly made by his trial counsel that the prosecutor told him "negotiating the case was 'always on the table.'" (Filing No. 1 at 80). As the district court concluded, Ellis cannot meet the stringent requirements of §2254(e) to expand the record here. But even if considered, the statement does nothing to establish that the State was going to make an offer and again, it had little incentive to do so. Ellis' reliance upon *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003), is also misplaced. There, it was undisputed that the government had extended a plea offer, that defense counsel communicated the offer to the defendant, and he rejected it. *Id.* at 722. The primary issue was defense counsel's mis-advisement about sentencing exposure. The court still rejected the defendant's ineffective assistance claim, concluding in part that a "defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later §2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer." *Id.* at 723. The court finds this same reasoning applies to this §2254 claim. There is no evidence in the record indicating that Ellis was ever willing to accept any responsibility for his actions or to negotiate any plea deal with the State.

---

[17] Ellis' Petition notes that within a month of being charged in this case, he began serving an "effective life sentence in a separate case: He was 53 years old and had just been sentenced to serve 60 years without parole in *State v. Ellis*, Douglas County Case No. CR10-9062371 (Sentencing Order, Apil 11, 2007)." The sentence Ellis refers to was for his 2007 conviction and sentence for tampering with a witness (Antoinette Pollack), and his sentence was enhanced because he was found to be a habitual offender. *See Ellis v. Hansen,* 2017 WL 3911582, at *1 (D. Neb. Sept. 6, 2017).

**Claims 7 and 7.1:** *Prosecutorial Misconduct and Ineffective Assistance of Counsel*

*Claim 7(i) to (vi)*

The allegations in Claim 7 arise from statements made by the prosecution in its closing argument at Ellis' trial which he contends violated his Fifth, Sixth, and Fourteenth Amendment rights. (Filing No. 1 at 90-97). Those alleged statements included: (i) inflammatory arguments; (ii) reflections on the victim's attributes; (iii) bolstering witness credibility; (iv) denigration of defense counsel; (v) improper comments on the Propensity Evidence; and (vi) arguing misleading DNA facts. (Filing No. 1 at 90-96). Ellis acknowledges that claims 7(i)-(iv) and (vi) are procedurally defaulted. (Filing No. 54 at 55). He makes no argument for excusing the procedural default under *Coleman*, and upon a review of the record the court can find no evidence which would establish an *external* impediment to the filing of those claims on direct appeal. All of the factual bases supporting the claims were available at the time of Ellis' direct appeal, rendering any attempt at excusing the procedural default under *Coleman* unsuccessful. *See Coleman*, 501 U.S. at 753. The court accordingly finds that the procedural defaults of 7(i)-(iv) and (vi) cannot be excused and recommends they be denied.

In Claim 7(v), Ellis alleges that the prosecution relied upon improperly admitted evidence to support its argument that the Propensity Evidence could be used to prove Ellis' propensity to commit Amber's murder. (Filing No. 1 at 96). The parties agree that Claim 7(v) was raised on direct appeal and therefore can be reviewed on the merits. (Filing No. 26 at 49-50; Filing No. 30 at 49-50). But Ellis argues that the Nebraska Supreme Court's analysis was incomplete, in that the state court reached its decision based only on state law and did not reach the merits of his federal claims. (*See* Filing No. 54 at 56, *citing* Filing No. 13-6, at 54). If not adjudicated on the merits, this court would be obligated to review the claim under the less deferential pre-AEDPA standard rather than the deferential standard of AEDPA. *See Cox v. Burger*, 398 F.3d 1025, 1029-30 (8th Cir. 2005). The court agrees with Respondent, however, that the Nebraska Supreme Court adjudicated Ellis' federal claim on the merits, therefore the deferential standard of AEDPA applies. (Filing No. 60 at 22-23, citing Filing No. 13-1 at 7, 10).

"A reasonable application of established federal law 'does not require citation of [United States Supreme Court] cases—indeed, it does not even require *awareness* of [the] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *See Id.* at 1030

44

(*quoting Early v. Packer*, 537 U.S. 3, 8 (2002)) (emphasis in original). Here, the Nebraska Supreme Court determined that the evidence admitted was not prejudicial because of the strength of the States' remaining evidence. Similar to the case law cited by the Nebraska Supreme Court, federal law requires that the remarks made must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *United States v. Conrad*, 320 F.3d. 851, 855 (8th Cir. 2003). Ellis does not show how the Nebraska Supreme Court's analysis resulted in a decision that was contrary to or involved an unreasonable application of established federal law, under 28 U.S.C. § 2254(d). Applying the deferential standard of AEDPA, this court finds that the prosecution's remarks regarding the Propensity Evidence were not prejudicial and Claim 7(v) is without merit. The claim accordingly should be denied.

### Claim 7.1, Ineffective Assistance

Ellis alleges in Claim 7.1 that his trial counsel was ineffective for failing to object, move for a mistrial, or ask for a curative instruction, concerning the same statements identified in Claim 7(i)-(vi). (Filing No. 1 at 96-97). He argues that any procedural default should be excused under *Martinez-Trevino*. (Filing No. 54 at 61). To substantiate this claim, Ellis must show the statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *DeChristoforo*, 416 U.S. at 643). Generally, "the prosecutor's closing argument [must have been] so inflammatory and so outrageous that any reasonable trial judge would have sua sponte declared a mistrial." *See Sublett v. Dormire*, 217 F.3d 598, 600 (8th Cir. 2000) (citation omitted).

The Eighth Circuit has construed the rule set forth in *Darden* as a two-part test for establishing prosecutorial misconduct: (1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *Conrad*, 320 F.3d. at 855. "The facts of each case must be reviewed independently to ascertain whether the comment was 'unduly prejudicial,' or was 'plainly unwarranted and clearly injurious'" *United States v. Splain*, 545 F.2d 1131, 1135 (8th Cir. 1976) (internal citations omitted). The court must consider the cumulative effect of the alleged misconduct, the strength of the properly admitted evidence of a defendant's guilt, and any curative instructions given. *See Graves v. Ault*, 614 F.3d 501, 507-08 (8th Cir. 2010). The court has reviewed all of Ellis' arguments and the contested statements and finds that most

45

were permissible under established standards and case law governing prosecutorial statements. The court further finds that claims 7(i)-(iv), and (vi) are not substantial claims which may excuse the procedural default of Claim 7.1. The following is a brief analysis of some of those statements:

In Claim 7(i), Ellis argues the prosecution made improper inflammatory arguments when it discussed the photographs of Amber's body, made calls for justice, and told the jurors it was their responsibility to convict Ellis. (Filing No. 1 at 90-92). However, the prosecution is permitted to: make a fair response to defense counsel arguments in rebuttal (*See United States v. Barnett,* 26 F.3d 127, \*2 (8th Cir. 1994); call for justice or appeal to the jury to act as the conscience of the community so long as the call is not "calculated to inflame" (*See United States v. Obi,* 25 F.4th 574 (8th Cir. 2022)); and remind the jury of their duty to follow the law. None of the remarks identified in Claim 7(i) were improper, therefore Ellis cannot establish a substantial claim for ineffective assistance of counsel.

In Claim 7(ii), Ellis alleges the prosecution's "lengthy comments" regarding Amber's personal attributes effectively constituted an improper appeal to the jury's sympathies for the victim as evidence of prosecutorial impropriety, relying upon *State v. Dubray*, 854 N.W.2d 584, 604 (Neb. 2014). (Filing No. 1 at 93). Ellis refers to comments describing Amber as a "responsible little girl" and a "good kid" who enjoyed singing, volunteering, and helping others. (Filing No. 1 at 92-93, *citing* Filing No. 13-25 at 177-78). "It is well established that appeals to the passion, prejudice, or sympathy of jurors during closing argument are improper, and may be grounds for reversal." (Filing No. 26 at 52-53, *citing United States v. Eagle*, 515 F.3d 794, 805 (8th Cir. 2008)). However, when the statements are simply a summary of trial testimony concerning events leading up to an event or a description of the evidence, they are appropriate. Such was the case here. But even if the statements went beyond the bounds of permissible argument, the "senseless and unspeakably brutal" death of a child naturally evokes deep sympathy from the jury, so brief comments are unlikely to "evoke any further appreciable degree of sympathy" for the victim. *See United States v. Johnson,* 495 F.3d 951, 980 (8th Cir. 2007). The comments here were not so prejudicial so as deprive the defendant of a fair trial, and Ellis failed to establish any basis which could support a substantial claim of ineffective assistance of counsel for failing to object to them.

In Claim 7(iii), Ellis alleges the prosecution's comments regarding the credibility of so-called jailhouse informants was inappropriate and prejudicial because "making credibility

46

determinations is exclusively the role of the [trier] of fact." (Filing No. 1 at 95-96). A prosecutor cannot vouch for the credibility of a witness, but can make arguments to support their theory of the case, so long as the comments rest on reasonably drawn inferences from the evidence. *See Dubray,* 854 N.W. 2d at 604; *United States v. Karam,* 37 F.3d 1280, 1289 (8th Cir. 1994). Here, the prosecutor was not vouching for the witnesses' credibility, but instead argued inferences from the evidence to show why the witnesses' accounts made sense. In particular, the prosecutor commented that certain informer testimony was "Believable? Credible? Absolutely. Because [Ellis'] questions were so bizarre, out of the norm, that's why they're credible. That's what makes them credible." (Filing No. 13-25 at 206-08, 210). Further, Ellis' counsel argued in closing that the prosecution's witnesses lacked credibility and they had motivation to testify for the prosecution beyond the desire to tell the truth. A prosecutor's comments are generally not inappropriate when they are made in rebuttal to credibility claims by the defense. *See United States v. Lopez*, 414 F.3d 954, 960 (8th Cir. 2005); (Filing No. 13-25 at 185-89). The statements at issue here do not support a finding of prosecutorial misconduct and Ellis has not established any basis which could support a substantial claim of ineffective assistance of counsel for failing to object to them.

In Claim 7(iv), Ellis argues the prosecution repeatedly insinuated that defense counsel was lying to the jury, noting that he said to the jury that defense counsel was "trying to confuse you" and was "throwing out red herrings" (Filing No. 13-25 at 205, 221). The comments cited, delivered in a spirited summation, rested on reasonably drawn inferences and were intended to highlight the relative believability of the witnesses for the State and the defense. The comments were not directed at defense counsel, but were made to highlight the improbability of defense counsel's theories, which does not rise to a prejudicial level. The statements at issue do not support a finding of prosecutorial misconduct and Ellis has not established any basis which could support a substantial claim of ineffective assistance of counsel for failing to object to them.

In Claim 7(v), Ellis argues the prosecution improperly argued propensity evidence and trial counsel failed to object. Trial counsel objected to the remarks during rebuttal and moved for mistrial. (Filing No. 13-20 at 225; Filing No. 13-25 at 220). Nonetheless, Ellis argues his trial counsel should have objected during closing argument. (Filing No. 1 at 21). On direct appeal, the Nebraska Supreme Court determined the court erred in admitting certain propensity evidence, but found that admission was not prejudicial and this court has agreed. The court cannot find Ellis has

47

raised a substantial claim to excuse the default of the corresponding ineffective assistance claim where the Nebraska Supreme Court has already determined that the admission of the evidence was not prejudicial.

In Claim 7(vi), Ellis argues the prosecution argued misleading DNA facts to the jury. Similar issues are addressed at length in Claim 3, *supra* at pp. 28-33, where the court ultimately found Claims 3.1 to 3.6 are procedurally defaulted without excuse to proceed and are not substantial claims. Accordingly, there can be no ineffectiveness for failing to object to the same evidence.

The court further finds that even if some comments made by the prosecutor at trial were improper, that alone is not enough to overturn Ellis' criminal conviction. The statements must again be viewed in context and "only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). For the reasons already stated, the court does not find the prosecution's statements standing alone or taken collectively rendered Ellis' trial so unfair that his conviction equates to a denial of due process. *Darden*, 477 U.S. at 181. He has accordingly not made a substantial claim, or one with any merit. The evidence of Ellis' guilt was overwhelming and the trial court instructed the jury that the statements and argument of counsel were not evidence. *Eagle*, 515 F.3d at 806 ("A district court's instruction that closing arguments are not evidence is a curative action that serves to alleviate any risk of prejudicial impact.") (citation omitted)). These claims should accordingly be denied in their entirety.

**Claim 8: *Judicial Bias***

Ellis alleges that the trial judge was biased against him in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and he should have recused. (Filing No. 1 at 97). He argues that Judge Schatz made pretrial and trial rulings against him and presided over a prior criminal case in which Antoinette was the named victim, which resulted in the judge predetermining her credibility as a witness at his aggravation hearing. Ellis admits that the claim is procedurally defaulted, but alleges this violation is a "structural error" warranting automatic reversal. (Filing No. 54 at 64 *citing Murray v. Carrier*, 477 U.S. 478, 495 (1986); *In re Murchison*, 349 U.S. 133, 135 (1949) and *Davila*, 569 U.S. at 611 ("We have characterized as 'structural' 'a

very limited class of errors' that trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole")).

"The defining feature of a structural error is that it 'affects the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver*, 582 U.S. at 295 (*quoting Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). The "denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt" are some examples. *Davila*, 569 U.S. at 611. While judicial bias may constitute as a structural error under some circumstances, they are limited. *See, e.g.*, *Quercia v. United States*, 289 U.S. 466, 468 (1933) (reversing judgment where a judge advised the jury of the judge's assessment of the defendant's credibility); *United States v. Pritchett*, 699 F.2d 317, 320 (6th Cir. 1983) (reversible error where the trial court confirmed a fact the prosecution was unable to prove which suggested the defendant was guilty by association); *Tyler v. Swenson*, 427 F.2d 412, 417 (8th Cir. 1970) (finding reversible error where "judge's recollection was the only testimony which refuted petitioner's claim"). "Unfavorable rulings, even 'ill-founded' rulings, do not by themselves demonstrate judicial bias or structural error," *Kachina v. Roy*, 2013 WL 375573, at *3 (D. Minn. Jan. 31, 2013) (*citing Jones v. Luebbers*, 359 F.3d 1005, 1013 (8th Cir. 2004)), nor do a judge's hostile remarks, *see United States v. Thomason*, 991 F.3d 910, 916 (8th Cir. 2021). And even if a structural error is established, the petitioner must still show prejudice sufficient to overcome a procedural default. *See Hunt v. Houston*, 563 F.3d 695, 705 n.2 (8th Cir. 2009).

Ellis has not met these high burdens here. Reviewing courts must presume the honesty and integrity of judges and the record here "presents no facts indicating either actual bias, or a possible temptation so severe that we might presume an actual, substantial incentive to be biased." *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1380 (7th Cir. 1994); *see also Withrow v. Larkin*, 421 U.S. 35, 47 (1975). While Judge Schatz may have denied many of Ellis' pretrial and trial motions, it was not without good reason. He granted some too. As to the credibility of witnesses, Judge Schatz acknowledged Antoinette's involvement as a victim in a prior case, but made clear that his determinations would be limited to only her testimony offered in this case. Indeed, when denying Ellis' motion to recuse, he affirmatively stated "I see no reason, number one, that I have formed any opinion about her credibility prior to her having testified, nor how that

could possibly affect my weighing her testimony given in this Court in July of this year on this particular case." (Filing No. 13-17 at 198-99).

The court finds no reason in the record to doubt Judge Schatz' explanation and assurance that he could remain unbiased when considering Antoinette's testimony, and Ellis does not explain how the remaining denials of various motions provide any further evidence of even potential bias. This includes his additional argument that Judge Schatz somehow was influenced by pretrial publicity. This is a bold claim and not one supported by the record. As one district court noted, "how can alleged publicity disseminated by the news media (which has not been shown to be prejudicial except for affiant's conclusion) be grounds for jumping to the bold conclusion, without more, that the judge was exposed to it, believed it, and will be influenced by it in determining the merits of the present case?" *United States v. Sinclair*, 424 F.Supp. 715, 719 (D. Del. 1976).

For these reasons, the court finds no structural error sufficient to excuse Ellis' procedural default. The facts at issue were clearly known to Ellis and his counsel before and the claim should have been raised on direct appeal. The claim also fails on the merits as there is no evidence in the record to support it. The court accordingly recommends that the claim be denied.[18]

## Claim 10- *Statutory Aggravating Factors*

In claims separately designated as 10[19], 10.1 and 10.2, Ellis argues that his death sentence relies on two unconstitutionally vague statutory aggravating factors set forth in *Neb. Rev. Stat. § 29-2523(1)(a) and (1)(d).* He argues that the panel was arbitrary and capricious in applying the unconstitutional aggravating circumstances and his sentence should be vacated. For the following reasons, the undersigned finds that Claim 10.1 is procedurally defaulted and there is no excuse for the default and Claim 10.2 is without merit. As the court recommends denial of these claims with

---

[18] The court will skip Claim 9 and proceed to Claim 10 as Ellis did in his Brief in Response to Respondent's Answer (Filing No. 54 at 66-67). It appears Ellis acknowledges that Claim 9 is not an independent claim, but rather a reiteration of his prior arguments that Claims 5 and 6 are "substantial" ineffective assistance of counsel claims resulting in an excuse for any procedural default. That analysis has already been made and need not be repeated.

[19] Ellis cites to constitutional amendments and case law under the heading for Claim 10, but makes no argument in his Petition. The court accordingly makes no separate analysis for Claim 10.

prejudice, it need not address the merits of Ellis' argument that the application of the two statutory aggravating factors was arbitrary and capricious.

### Claim 10.1 - Neb. Rev. Stat. § 29-2523(1)(a)

Ellis raised the argument that Neb. Rev. Stat. § 29-2523(1)(a) is unconstitutionally vague to the Nebraska Supreme Court in his first postconviction motion and the court rejected that argument on the merits. (Filing No. 13-1 at 17-18). However, Ellis' argument in this proceeding is different, in particular that Johnson v. United States, 576 U.S. 591 (2015) announced a "new rule" regarding a residual clause which has been held to be retroactive and applicable here. (Filing No. 1 at 108, citing Welch v. United States, 578 U.S. 120, 129 (2016)). Thus, he argues this court "must apply its holding to Mr. Ellis' exhausted claim." (Filing No. 54 at 75). Respondent contends that even if Johnson contained a "new rule" applicable to § 29-2523(1)(a), Ellis should have, but did not, exhaust the claim by raising it to the state courts by way of postconviction motion after Johnson was decided, rendering Claim 10.1 procedurally defaulted. (Filing No. 26 at 62; Filing No. 30 at 62).

Johnson was decided four years after the Nebraska Supreme Court upheld Ellis' conviction on direct appeal. In it, the Supreme Court held that the residual clause of the Armed Career Criminal Act of 1984 was unconstitutionally vague under the Fifth and Fourteenth Amendments to the U.S. Constitution. See Johnson, 576 U.S. 591. Ellis asserts his death sentence relies, in part, on similar language found at Neb. Rev. Stat. § 29-2523(1)(a), therefore his sentence violates his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and must be vacated.

Under Nebraska law, however, a defendant has one year from the date when a constitutional claim is initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court to file a verified motion for postconviction relief, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review. See Neb. Rev. Stat. § 29-3001(4)(d). As such, if Johnson announced a new rule applicable to Ellis' vagueness claim, any postconviction motion addressing that claim should have been raised no later than one year after June 26, 2015, when Johnson was decided. Claim 10.1 was not fairly presented to the Nebraska Supreme Court, and the time for doing so has passed. By failing to timely raise the claim, Ellis did not give the Nebraska Supreme Court the "full and fair opportunity" to determine whether the language in § 29-2523(1)(a) is similar to the language of the Armed Career Criminal Act's residual

clause at issue in *Johnson,* and whether the Nebraska statute contains the "two features" that rendered the residual clause unconstitutionally vague. The federal court cannot overstep and conduct that analysis first. *See O'Sullivan,* 526 U.S. at 845.

In addition, although Ellis raised the alleged unconstitutional vagueness of § 29-2423(1)(a) in his state proceeding, his argument in this proceeding relies on a different legal theory not presented before. A habeas petitioner cannot avoid procedural default by raising a claim in federal court which was raised in state court under a different legal theory. *Sweet v. Delo*, 125 F.3d 1144, 1153, n 12 (8th Cir. 1997). As there appears to be no external impediment to Ellis raising this claim with *Johnson* to the state courts prior to filing his Petition, the procedural default of Claim 10.1 cannot be excused. Therefore, this Court recommends Claim 10.1 be denied as procedurally defaulted.[20]

### *Claim 10.2 - Neb. Rev. Stat. § 29-2523(1)(d)*

In Claim 10.2, Ellis argues the sentence aggravator contained in *Neb. Rev. Stat. § 29-2523(1)(d)* is unconstitutionally vague and supplies no meaningful definition of the terms for Nebraska juries to consider in their determination as to whether the factor applies. (Filing No. 1 at 110-19). Section 29-2523(1)(d), states in its entirety: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." The parties agree that this claim was raised on direct appeal (*see* Filing No. 13-6 at 78-88; Filing No. 26 at 63), and the Nebraska Supreme Court found no merit to Ellis' arguments that § 29-2523(1)(d) is unconstitutional. (Filing No. 13-1 at 18-20). But Ellis argues in this case that the statute and interpretations by the Nebraska Supreme Court have not sufficiently defined the terms "exceptional depravity," "ordinary standards of morality and intelligence," and "helplessness." (Filing No. 13-6 at 79-80).

The Nebraska Supreme Court expressly considered this argument, noting that "[f]ew provisions of Nebraska law have been more challenged and as they are currently construed, they

---

[20] The court has not ignored Ellis' argument in Claim 10.1 that his death sentence was based on the arbitrariness and capriciousness of the sentencing panel in applying *Neb. Rev. Stat. § 29-2523(1)(a)* and therefore must be vacated. (Filing No. 1 at 109). However, because the claim is procedurally defaulted, and the court has not concluded that the statute is void-for-vagueness, the argument will not be considered on the merits.

are constitutional." (Filing No. 13-1 at 18). The state court acknowledged Ellis' argument that the term "helpless" does not have a constitutionally acceptable definition relating to the "exceptional depravity prong" of § 29-2523(1)(d). However, it noted that the Eighth Circuit has held that the construction of the exceptional depravity aggravator as modified in *State v. Palmer*, 399 N.W. 2d 706, 731-32 (Neb. 1986) (*Palmer III*), was "clearly constitutional." (Filing No. 13-1 at 19, *citing Palmer v. Clarke,* 408 F.3d 423, n. 67 (8th Cir. 2005)). The aggravator in *Palmer III* included "(1) [T]he apparent relishing of the murder by the killer, (2) the infliction of gratuitous violence on the victim, (3) the needless mutilation of the victim, (4) the senselessness of the crime, and (5) *the helplessness of the victim*." (emphasis added). These are the same factors applied in Ellis' case. (Filing No. 13-15 at 54).

Ellis further argues that *Palmer* "should be revisited in light of Mr. Ellis' current arguments." (Filing No. 54 at 78). But that is not for this court to do, as it is obligated to follow the law as it is, not how Ellis thinks it should be. The Nebraska Supreme Court's decision to deny Ellis' void for vagueness challenge to § 29-2523(d)(1) on the merits was not contrary to, and did not involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. The court also notes that Ellis filed a petition for writ of certiorari alleging his Eighth and Fourteenth Amendment rights were violated when the jury was instructed on an unconstitutionally vague aggravating factor. (Filing No. 13-8). He made many of the same arguments he made in the petition before this court, including an argument that helplessness is vague and overbroad. The U.S. Supreme Court entered an order denying his petition for writ of certiorari. (Filing No. 13-2). Accordingly, the undersigned recommends that Claim 10.2 be denied.

## Claims 11 & 12: *Atkins v. Virginia*

Ellis argues his death sentence constitutes cruel and unusual punishment under the Eighth Amendment because of intellectual disabilities and severe mental illness. (Filing No. 1 at 119-125, citing *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)). He admits that neither claim was raised on direct appeal nor in his First PCM, but he seeks to excuse any default under *Martinez-Trevino* and because he has raised the claims now in his Second PCM. Again, the district court has already determined that Ellis' efforts to raise the claims now in state court are futile as they are procedurally barred under state law.

53

Moreover, Respondent is correct that the exceptions under *Martinez* do not apply because the claims were not brought under the guise of ineffective assistance of trial counsel in his habeas petition. The Supreme Court has made clear that "AEDPA limited rather than expanded the availability of habeas relief[,]" and that the analysis set forth in *Martinez* and its predecessor *Coleman* "reiterate[d] that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation[.]" *Shinn*, 596 U.S. at 386 (internal quotations and citations omitted). Because Ellis did not assert an independent constitutional violation for ineffectiveness in this habeas petition, he cannot show cause.

But even if considered further, the court can find no evidence in the record which would establish an external impediment to Ellis raising these claims on direct appeal as required by *Coleman*. The factual and legal arguments presented were readily available to him prior to the filing of his appeal. *See Coleman*, 501 U.S. at 753. Nor can the court find that Ellis has asserted a substantial claim for ineffective assistance of counsel sufficient to excuse his default. The court need not restate its prior analysis concerning these issues in full, but will note again that the IQ results on which Ellis now relies upon to establish an intellectual disability were considered invalid and not consistent with his level of daily functioning. (Filing No. 13-32 at 189-90). And both psychological evaluations completed before Ellis' sentencing hearing found him to be competent. (Filing No. 13-32 at 174-183). The court recommends that Claims 11 and 12 be denied.

**Claim 13: *Nebraska's Death Penalty Sentencing Scheme***

Ellis argues Nebraska's sentencing scheme is unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments and *Hurst v. Florida*, 577 U.S. 92 (2016) (holding that Florida's capital sentencing scheme violated the Sixth Amendment because it allowed a judge, rather than the jury, to find aggravating factors sufficient to impose the death penalty). While it appears Ellis raised the constitutional issues in his direct appeal, which were wholly rejected by the Nebraska Supreme Court, he did not raise his *Hurst* claim on either direct appeal or even through collateral relief. Granted, the *Hurst* decision was not decided until after the conclusion of Ellis' direct appeal, but the Supreme Court has since made clear that *Hurst* does not apply retroactively on collateral review. *McKinney v. Arizona*, 589 U.S. 139, 145 (2020); *see also State v. Lotter*, 917 N.W.2d 850, 863-64 (Neb. 2018).

As to the other claims, and even if *Hurst* is considered, Ellis has not met his high burden under AEDPA to show an unreasonable determination of the facts or that the Nebraska Supreme Court's analysis was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Ellis makes the same attacks here that he did to the Nebraska Supreme Court, including that Nebraska's death penalty sentencing scheme, *Neb. Rev. Stat.* §§ 29-2519 *et seq.*, wrongfully deprives the jury from considering mitigation evidence, it deprives the jury from weighing mitigation factors with aggravating ones, it confusingly bifurcates the sentencing phases between jury and judge, and it deprives the jury from making the ultimate determination of life or death. The Nebraska Supreme Court rejected each of these arguments and its analysis was consistent with clearly established federal law.

The primary contention underlying all of these claims is what the jury must decide, as opposed to judges. As the Nebraska Supreme Court concluded, the constitution mandates that it be a jury who must find the existence of aggravating circumstances because "[i]t is the finding of an aggravating circumstance increasing the defendant's authorized punishment which implicates the right to trial by jury[.]" (Filing No. 13-1 at 21).

> We have explained that the U.S. Supreme Court's holding in *Ring v. Arizona* does not require that a jury make findings other than the existence of the aggravating circumstances upon which a capital sentence is based and that neither *Ring* nor any other authority 'require[s] that the determination of mitigating circumstances, the balancing function, or proportionality review be undertaken by a jury.'

(Filing No. 13-1 at 21). (internal quotation and citations omitted). The United States Supreme Court said the same thing.

> Under *Ring* and *Hurst*, a jury must find the aggravating circumstance that makes the defendant death eligible. But importantly, in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range.

*McKinney*, 589 U.S. at 144.

The Nebraska Supreme Court rejected each of Ellis' constitutional claims and on good authority. A unanimous jury heard the evidence and found two statutory aggravating factors existed. It was then up to the judges to weigh the aggravating factors with mitigation evidence and determine the appropriate sentence. The United States Supreme Court has expressly approved of

55

this approach. *See Id.* at 145 ("the decision in *Ring* 'has nothing to do with jury sentencing. What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed.' Therefore, as Justice Scalia explained, the 'States that leave the ultimate life-or-death decision to the judge may continue to do so'") (emphasis in original, internal quotation and citations omitted). The claims accordingly should be denied.

**Claim 14:** ***Proportionality Review and Race***

Ellis argues that his death sentence was imposed because of his race in violation of the Eighth and Fourteenth Amendments. He acknowledges the claim is procedurally defaulted because he failed to raise it on direct appeal. He seeks to excuse that default by arguing that the United States Supreme Court announced a new rule of constitutional law in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023), wherein the Court concluded that affirmative action programs that explicitly consider race in college admissions are unconstitutional. Ellis tenuously suggests that the "proportionality review" required of the Nebraska Supreme Court in death penalty cases "undeniably considers the race of the defendant as a point of comparison" and that review "cannot withstand strict scrutiny under the Equal Protection Clause." (Filing No. 54 at 87). The court finds this argument to be without merit and the claim is procedurally defaulted and should be denied.

Pursuant to *Neb. Rev. Stat.* § 29-2521.03, the Nebraska Supreme Court must on appeal "determine the propriety of the sentence in each case involving a criminal homicide by comparing such case with previous cases involving the same or similar circumstances." (Filing No. 13-1 at 33). The purpose of this review is to ensure that no sentence imposed will be "greater than those imposed in other cases with the same or similar circumstances." (Filing No. 13-1 at 33). Respondent is correct that Nebraska's proportionality review does not consider the defendant's race, rendering the analysis in *Students for Fair Admissions* inapplicable. (Filing No. 60 at 31). That case is an Equal Protection decision about race-based decision-making, it is not a Sixth or Eighth Amendment sentencing case.

The Nebraska Supreme Court's proportionality review in this case never considered Ellis' race, but instead the facts and circumstances of prior cases where the death penalty had been imposed. It referenced several similar cases involving sexual assaults and murder where the death penalty had been imposed, in part, because those defendants also had prior crimes of violence and

because the murders were found to be especially heinous, atrocious or cruel. (Filing No. 13-1 at 33) (citing *State v. Gales*, 694 N.W.2d 124 (Neb. 2005) and *State v. Williams*, 287 N.W.2d 18 (Neb. 1979)). After considering its "capital jurisprudence, and taking note of comparable cases," the Nebraska Supreme Court concluded that "the imposition of the sentence in this case was not greater than those imposed in other cases with the same or similar circumstances." (Filing No. 13-1 at 34). "Having considered the evidence, we are of the opinion that the aggravating circumstances—particularly the cruelty inflicted by Ellis' abduction and sexual assault of Amber— justify imposing the death penalty[.]" (Filing No. 13-1 at 33). Ellis' race again had nothing to do with these conclusions. While Ellis broadly argues that the proportionality review process itself is tainted because a disproportionate amount of minorities receive a death sentence or because "black men are more likely to be sentence to death for crimes involving rape or sexual assault," (Filing No. 54 at 88), these wholesale statistical arguments have been rejected as a defendant must show purposeful discrimination in their particular case. *See McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987). No such showing has been made here.

**Claim 15: *Eighth Amendment Challenges***

Ellis challenges the death penalty under the Eighth Amendment as cruel and unusual punishment. He broadly argues that imposition of the death penalty is excessive, fails to comport with evolving standards of decency, and is unreliable and/or is imposed inconsistently in violation of the equal protection of the laws. The claims are procedurally defaulted as these challenges were not made on direct appeal. While it appears Ellis challenged parts of Nebraska's death penalty statutes as unconstitutional in his appeal, he did not raise the broader issues asserted here. Ellis makes no effort to excuse the default and the court can find none.

Moreover, the claims have already been rejected and lack merit. The United States Supreme Court recently confirmed that "[t]he Constitution allows capital punishment." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019). The Court said the same thing a decade earlier in *Baze v. Rees*, 553 U.S. 35, 47 (2008) ("We begin with the principle, settled by *Gregg*, that capital punishment is constitutional") (internal citation omitted); *see also Glossip v. Gross*, 576 U.S. 863, 869 (2015) ("it is settled that capital punishment is constitutional"). In *Bucklew*, the Court began with an historical overview of the Eighth Amendment and noted that its adoption did not outlaw the practice of capital punishment. "On the contrary- the Fifth Amendment, added to the Constitution at the same

57

time as the Eighth, expressly contemplates that a defendant may be tried for a 'capital' crime and 'deprived of life' as a penalty, so long as proper procedures are followed." *Id.*

As the Court further noted, however, this "doesn't mean the American people must continue to use the death penalty. The same Constitution that permits States to authorize capital punishment also allowed them to outlaw it. But it does mean that the judiciary bears no license to end a debate reserved for the people and their representatives." *Id.* Nebraska law permits the death penalty and the Nebraska Supreme Court has repeatedly upheld it. *See State v. Jenkins*, 931 N.W.2d 851, 883-84 (Neb. 2019) ("Less than 3 years ago, Nebraskans had the opportunity to eliminate the death penalty and 61 percent voted to retain capital punishment. This vote demonstrates that the people of Nebraska do not view the death penalty as being contrary to standards of decency"). The federal judiciary "bears no license" to summarily dictate otherwise, especially within the strict confines of habeas review under AEDPA. The court accordingly recommends that Claim 15 be denied.

## V.     OTHER ISSUES

In addition to his many claims, Ellis seeks to revisit other issues already addressed and rejected by the district court in its Memorandum and Order denying a stay (Filing No. 46), and he seeks an evidentiary hearing to both excuse and develop some of the procedurally defaulted claims in his petition. (Filing No. 54 at 6-12). To the extent these requests are liberally construed as motions, they were not brought separately as required by our local rules. *See* NECivR. 7.1.

Moreover, the requests lack merit and should be denied. To the extent Ellis' motion regarding the stay is one to alter or amend under Fed. R. Civ. P. 59(e), he is out of time, and notably Ellis did not timely seek other relief or seek to appeal the district court's order. To the extent the motion falls under Fed. R. Civ. P. 60(b), he has not shown mistake, inadvertence, surprise, or excusable neglect nor has he established any newly discovered evidence, fraud, or other reasons justifying relief. The rules are not designed to provide an avenue for a disappointed party to relitigate a matter previously decided by the court. *United States of America v. Metropolitan St. Louis Sewer District*, 440 F.3d 930, 933-34 (8th Cir. 2006). Ellis is also not entitled to an evidentiary hearing for many of the same reasons already noted herein, including that none of his defaulted claims are substantial or have merit. Ellis also cannot satisfy the strict standards sufficient to justify an evidentiary hearing in federal court under AEDPA, 28 U.S.C. §2254(e)(2).

58

## VI.    CERTIFICATE OF APPEALABILITY

AEDPA bars a petitioner from appealing the denial of a § 2254 habeas petition unless he is first granted a certificate of appealability. *See* 28 U.S.C. § 2253(c); *see also* Fed. R. App. P. 22(b)(1). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). That showing requires the petitioner demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If claims are denied on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasizing that the "prisoner must demonstrate substantial underlying constitutional claims"). Applying these standards here, the court recommends that Ellis not be granted a certificate of appealability as his claims lack merit, are not substantial, and/or are procedurally defaulted without excuse as set forth herein.

## VII.    CONCLUSION

For these reasons, the undersigned hereby RECOMMENDS to United States District Court Judge Brian C. Buescher, that:

1. The Petition for Writ of Habeas Corpus (Filing No. 1) be dismissed with prejudice;
2. Any motion for reconsideration or evidentiary hearing contained therein be denied; and,
3. No certificate of appealability be issued.


### ADMONITION

Pursuant to NECivR. 72.2, a party may object to a magistrate judge's order by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. Failure to timely object may constitute a waiver of any objection.

Dated this 9th day of January, 2026.

BY THE COURT:

s/ Ryan C. Carson
United States Magistrate Judge

59